104

*In re* ARTHUR J. AHERN, Attorney, Respondent.

*Opinion filed Sept. 28, 1962.—Rehearing denied Nov. 29, 1962.*

ARTHUR J. AHERN, *pro se.*

J. R. CHRISTIANSON, of Chicago, *amicus curiae.*

Mr. JUSTICE DAILY delivered the opinion of the court:

The committee on grievances of the Chicago Bar Association, acting as commissioners of this court under Rule 59, have filed a report recommending that respondent, Arthur J. Ahern, be disbarred from the further practice of law in this State. As the basis for such recommendation the committee found that respondent, upon two occasions, had diverted the funds of clients to his own use. Respondent, who was admitted to the practice of law in October, 1928, and who was previously censured by this court for unprofessional conduct, (*In re Ahern*, 23 Ill.2d 69,) has filed exceptions to the commissioners' report.

Evidence relating to the first of the present complaints

against respondent shows that he was retained to represent one Delmar Strong who was facing charges of driving a motor vehicle while intoxicated. For his services respondent charged and was paid a $100 fee. Strong was found guilty in the municipal court of Chicago on December 11, 1959, and was fined $100 plus $6 in court costs. The following day, Strong's mother, Pearl Montgomery, delivered $110 to respondent to be used for paying the fine and costs, and was given a receipt by the latter which stated: "for fine." A month later Strong received a letter from the court stating that the fine had not been paid and, when contacted by Mrs. Montgomery, respondent represented that he would make payment immediately. On May 4, 1960, new charges were filed against Delmar Strong, including one for reckless driving, and, according to his mother, he was confined in jail because the prior fine had not been paid. The mother testified that she called respondent and asked him to pay the fine, but the latter, while admitting his obligation, said he didn't have that kind of money. Mrs. Montgomery then secured her son's release by paying the fine herself and although she subsequently telephoned respondent seven or eight times attempting to recover the $110 she had given him, restitution was never made.

Respondent, who admits receiving the money for the payment of the fine, appeared as a witness before the commissioners and explained that, being busy in another court, he had entrusted the money to another lawyer, who was to pay the fine, and that he assumed it had been done until the events occurring after Strong's second arrest disclosed otherwise. However, he could not remember the name of the "other lawyer," whom he described as an elderly gentleman who was a familiar figure around the traffic court. He promised to supply the commissioners with the lawyer's name, if he could recall it, but this was not done. Respondent said he investigated at the bailiff's office and was prepared to pay the fine again, if necessary, but was prevented

from doing so because he was appearing in another court at the time Strong was first brought into court on the second charges. After Mrs. Montgomery had paid the fine, according to respondent, he subsequently appeared for Strong on two occasions in connection with the charges emanating from the second arrest and when he tried to reimburse Mrs. Montgomery for the $110, she told him to keep it as part of his fees in the second case and paid him an additional $100 as well. He said that thirty days after the second trial had been concluded Mrs. Montgomery started asking him for the return of the $110 but he refused.

The second complaint against respondent grew out of his representation of Zygmund Ulas, who was involved in a traffic accident in May, 1957, which resulted in the revocation of his driver's license and claims against him by three automobile owners for property damage. Respondent appeared for Ulas in criminal proceedings, wherein the latter was fined for drunken driving, and receipts in evidence, issued by respondent, disclose that between May 20 and June 20, 1957, Ulas paid him a total of $300, the last receipt reciting: "$150.00 balance of Attorney's fees and fine." Two of the claims for property damage were settled, other receipts issued by respondent indicating that he had received $125 from Ulas to make the settlements and an additional attorney's fee of $25, but the third car owner, one Clinton Wallace, brought suit against Ulas in the municipal court. Respondent filed an appearance in the cause, but no pleadings, and a default judgment was entered against Ulas in June, 1958, for $327.80 and costs.

On August 20, 1958, Ulas paid respondent $40 and was given a receipt by the latter stating the money received was to be used "In settlement of Wallace v. Zygmund Ulas." During October, 1958, Ulas became eligible for reinstatement of his driver's license but, upon making application, was advised the license would not be reinstated until the Wallace judgment was satisfied. Thereafter, during a

period extending to May 27, 1959, Ulas made payments of $297 to respondent, (making a total of $337,) the last receipt given by respondent acknowledging that payment of $87 was the "Bal. on Clinton Wallace." Two weeks later Ulas telephoned respondent and was told the latter would inquire into what was holding up the driver's license. In the next six months Ulas was never able to contact respondent although he telephoned frequently and went to his home on several occasions. When Ulas again sought to apply for a driver's license, he was advised by the Secretary of State in a letter dated March 1, 1961, that before his license could be reinstated he would have to settle the judgment for $327.80 entered against him in the municipal court during June, 1958. With the assistance of a friend Ulas further tried to contact respondent and, failing again, he complained to the bar association.

Other evidence in the record, including testimony by the attorney who had represented Clinton Wallace, established that the money received by respondent was never used to satisfy the judgment, and that it was never returned to Ulas. In the latter regard, respondent has represented in both his reply brief and oral argument in this court, *de hors* the record, that he has returned the money to Ulas. We digress to state that such a circumstance, even if restitution was actually accomplished, is of little aid to respondent. Settlements with clients do not preclude inquiry into the moral and professional quality of an attorney's acts prior to and in connection with the settlements. *In re Rosenberg*, 413 Ill. 567, 573; *In re Koptik*, 406 Ill. 141, 144.

In connection with the Ulas complaint, respondent filed no answer with the commissioners, did not appear and introduced no evidence in his behalf. These omissions he now explains by stating his actions had been honest and needed no defense. He did, however, present and argue objections to the committee's report claiming, as he does here, that he had always wanted to either pay out or return the

money, and thus be released from his obligation, but had never been able to find either Wallace, or his attorney, or Ulas. Additionally, he advances here the unsupported and dubious theory that his conduct should not be questioned because Ulas had not made his payments on the judgment in the manner promised, and that he, respondent, was an involuntary trustee of the funds because of the circumstance that Ulas caused the money to be delivered to respondent's home by a 14-year-old boy.

As may be seen from the evidence, respondent admits that he was given $110 by Mrs. Montgomery to pay a fine and costs, and likewise concedes he was given $337 by Ulas with which to satisfy the Wallace judgment. And if, as the commissioners did, we accept the testimony and evidence of the complaining witnesses as true, it clearly and convincingly appears that respondent did not use the monies for the purpose for which they were entrusted to him but, instead, diverted them to his own use. Specifically, his admission of the debt to Mrs. Montgomery on May 4, 1960, and his statement that he did not have "that kind of money" makes it evident that he used the money for other purposes, (cf. *In re Melin,* 410 Ill. 332,) whereas the same conclusion may be reached in the Ulas matter from respondent's evasion of his client, coupled with his failure, extending over a period in excess of three years, to either satisfy the judgment or return the money to Ulas. Cf. *People ex rel. Chicago Bar Association* v. *Simmons,* 341 Ill. 340.

To avoid the fact of conversion and the inevitable discipline which must follow, respondent contends that the evidence fails to show his motives were dishonest or fraudulent, (See: *In re Hansen,* 21 Ill.2d 326,) but shows instead that he was merely guilty of carelessness or mistaken judgment. (See: *In re Pelz,* 356 Ill. 200.) When laid beside the facts in evidence, however, these contentions have a hollow ring and respondent's explanations and attempted justifications are far from convincing.

In the Montgomery matter, while it is difficult to believe respondent would casually hand the money over to another to discharge his obligation of paying the fine, it taxes credulity that he could not remember the name of the other lawyer, or produce him at the hearing, particularly since he described the latter as a well-known and familiar figure in the traffic court. Nor do we attach credence to his testimony that he intended to reimburse Mrs. Montgomery once he found out the fine was unpaid, or importance to his further testimony, even if true, that Mrs. Montgomery later importuned him to keep the $110 as fees earned at the second proceeding against Strong. As to the first premise, the fact remains that respondent had already defaulted upon one promise to pay the fine two weeks after he had been given the money; as to the second, the circumstance that he might subsequently have earned further off-setting fees from his client would not, much in the manner of restitution, relate back to purge the moral wrong of converting the client's money in the first instance.

Respondent's explanation that he held the Ulas money for over three years because he could not find the judgment creditor, the latter's attorney, or Ulas, and because he did not know that the judgment could be satisfied by paying the money to the clerk of court is even less convincing. Indeed, coming from an attorney with over thirty years experience it is so clearly an irresponsible and inherently improbable an explanation as to be unworthy of consideration. The same may be said of his unsupported theory that his position is somehow justified because Ulas did not make monthly payments as promised, and because the payments were delivered to respondent by Ulas's 14-year-old brother. Neither circumstance explains away respondent's admitted receipt of the $337, or his failure to either satisfy the judgment or return the money to Ulas.

When all the evidence is considered, we fail to discern any honest motives or mere acts of carelessness. Instead,

the conclusion is inescapable that respondent acted in bad faith and converted the monies in question to his own use.

The wrongful conversion of a client's funds involves moral turpitude and in itself is such a flagrant violation of an attorney's oath as to warrant disbarment. (*In re Fumo, 22* Ill.2d 429; *In re Ashbach,* 13 Ill.2d 411.) Here, the conduct of respondent was even more reprehensible, and the unfavorable reflection on the legal profession more acute, due to the fact that one person was held unnecessarily in jail and another has been unable to secure a driver's license as a result of respondent's derelictions of duty. This court, in the proper discharge of its own duties, cannot permit acts of the type here portrayed to be perpetrated on the public, nor can we permit the name of respondent to remain on the rolls of attorneys as one who is worthy of the confidence of his clients and who meets the high standards of conduct the profession demands.

The finding and report of the commissioners is approved and the respondent's name is stricken from the roll of attorneys of this court.

*Respondent disbarred.*