(No. 37358.—

*In re* HAROLD N. LINGLE, Attorney, Respondent.

*Opinion filed March 27, 1963.*

CRAIG & CRAIG, of Mt. Vernon, and HILL AND HILL, of Benton, (GLENN E. MOORE and ROBERT S. HILL, of counsel,) for respondent.

RICHARD B. ALLEN, of Springfield, *amicus curiae.*

Mr. JUSTICE DAILY delivered the opinion of the court:

The committee on grievances of the Illinois State Bar Association, as commissioners of this court under Rule 59, have filed a report finding respondent, Harold N. Lingle, guilty of unprofessional conduct and recommending that he be disbarred from the further practice of law in this State. Respondent, who received an Illinois license in 1938, has filed exceptions to the report.

The commissioners have found respondent guilty of five separate instances of unprofessional conduct, most of which occurred during a period ranging roughly from late in 1959 to the early part of 1961 and may be briefly summarized as follows: (1) Failure and refusal to return a client's papers for fifteen months; (2) failure and refusal to return another client's papers for two months, coupled with misrepresentations to the client that the papers had been sent to him; (3) long-continued deception of another client by elaborate misrepresentation resulting in the client's loss of a valuable cause of action; (4) commingling and failure to account for a portion of $3000 paid in settlement of a minor's personal injury claim; and (5) commingling and conversion of the major portion of a $2750 settlement paid in a wrongful death action. Respondent contends generally that the charges in the complaints were not proved and that the findings of the commission in each instance are against the manifest weight of the evidence. We shall consider first the most serious of the findings, namely that respondent converted the money of a client.

In February, 1959, respondent was retained by Marvin Muckelroy, administrator of the estate of Mary Lou Fraser, deceased, to prosecute a wrongful death action against one Doyle L. Crabtree. It appears there was also a possible dramshop action arising out of the same occurrence, and on March 13, 1959, a tavern operator named Leonard Dominic was served with a notice by the Illinois Public Aid Commission that it claimed a lien on the "claim, de-

mand and/or cause of action" arising against Dominic as a result of Mary Lou Fraser's death. Respondent testified he thought a dramshop action had been filed against Dominic at the time such notice was received, but that he wasn't certain. He also stated he didn't know if his client, Muckelroy, had received a similar notice, but testified that he, respondent, had a "fuzzy" recollection of being contacted by somebody from the Public Aid office concerning a lien against any recovery in the wrongful death action. He blamed his haziness on personal problems which had beset him about that time and, in such regard, further proof was made that he had been ill with pneumonia in both January and March, 1960, and that late in March, 1960, it was discovered that his wife was suffering from leukemia, a disease from which she succumbed in September, 1960, after almost continuous hospitalization in Carbondale, Chicago, and St. Louis.

Respondent settled the wrongful death action for the sum of $2750 and, on November 12, 1959, on petition of the administrator, the county court approved the settlement and entered an order directing the administrator to disburse sums totalling $2,347.87 for court costs, attorney fees and expenses, and for a number of hospital and medical bills of the decedent. On the same date an insurance company draft for the amount of the settlement was endorsed by the administrator and turned over to respondent to make the disbursements. However, the only disbursement made by respondent, except for his own fees and expenses totalling $976.67, was to pay the bill of a Dr. Boswell in the amount of $240, which left the sum of $1533.43 in respondent's hands. And it appears that Dr. Boswell was paid only after the administrator had received several letters from the doctor requesting payment, and was forced to go to respondent about the matter. On this occasion respondent assured Muckelroy that everything was all right and would be taken care of.

In January, 1961, in excess of a year after the funds had come into respondent's hands for disbursement, the administrator, on the petition of another doctor who had not been paid, was cited to show cause in the county court why he had not paid the bills he was ordered to pay. Being unable to find or contact respondent, the administrator employed another attorney who represented him at the subsequent citation hearing. Respondent appeared at such hearing, which was held February 6, 1961, and stated that he had the balance of the settlement money in his possession, but that it was in his safety deposit box and was then inaccessible to him because the box and its contents were under an attachment which had issued in an unrelated civil proceeding. While appearing as a witness in the instant proceeding, respondent accounted for the presence of the money in the box by stating that he had cashed the settlement check, withdrawn what was due him for fees and expenses, and had placed the balance in an envelope which he marked and put into his safety deposit box. He said he had done this because he feared some difficulty with the Illinois Public Aid Commission in the case.

Returning to the events occurring on the day of the citation hearing, the new attorney for the administrator nonetheless requested the money from respondent and, within 30 minutes after the hearing, was advised by respondent that the money could be obtained at the latter's bank. Upon going there, the attorney was given a cashier's check for $1533.43 by a bank officer.

The money for the cashier's check came out of respondent's checking account at the bank, and left a balance of $192.85 in such account. Other bank records disclosed that respondent had borrowed $750 from the bank on February 4, 1961, which amount was deposited in the checking account, and that on February 6 respondent had made a deposit of $350 and also had transferred $801.74 from a savings account to the checking account. This left

a balance of $2550 in the savings account but, on February 11, 1961, that account was exhausted by debits of $1800 and $750, the latter going to pay off the bank loan obtained on February 4. Subsequently, according to defendant, when his safety deposit box was released from attachment, he took the cash out but did not save the marked envelope or deposit the money in a bank.

The above proof shows highly unprofessional conduct which served to embarrass the legal profession and to bring it into disrepute. Respondent's delay of over a year in making the distribution for which the money was entrusted to him was inexcusable. His conduct of exposing his client to a possible contempt citation was reprehensible. And while it is now claimed that the delay was justified, due to the possibility that the Public Aid Commission might have a lien and to the further possibility that it might be improper to pay the hospital and medical bills of the decedent out of a wrongful death settlement inuring to the benefit of the decedent's heirs, it is apparent that these are only belated excuses conceived to avoid the consequences of disciplinary action. At no time during the long period he retained the money did the respondent ever approach the court which had ordered the distribution on either matter. As was true in *In re Power,* 407 Ill. 525, respondent's conduct manifests an intent to retain the funds unless and until he was forced to distribute them or return them to the administrator.

Further, the proof shows a wrongful commingling of funds. Respondent, who had maintained special accounts on prior occasions, conceded that in this instance he had first deposited the settlement draft in a joint checking account he then maintained along with his wife. And while technically, perhaps, there was no commingling of funds when respondent put his client's money in the safety deposit box, we are of the belief that such a covert method of handling a client's funds is highly unprofessional and one

which can only create suspicion and harmful inference. A lawyer's clients, the courts and public alike, have a vital interest in his integrity and are entitled to require that he shun even the appearance of any fraudulent design or purpose. *In re Melin,* 410 Ill. 332.

The next charge against respondent arose out of his representation of Emma George, as guardian of the estate of Glenda George, a minor, in a personal injuries action stemming from the same accident in which the Fraser girl was killed. There was also a dramshop action filed in the minor's behalf and it appears that the Illinois Public Aid Commission served the interested parties, including the guardian, with a notice of lien in both actions. The personal injuries suit was settled for $3000 and on November 12, 1959, the county court approved the settlement, ordered the disbursement of sums totalling $1675.70 (for medical and hospital expenses, attorney fees and court costs,) and directed that the balance be invested in bonds to be held for the benefit of the minor. In this case also the settlement draft was endorsed and turned over to respondent to make the disbursements and, according to respondent, he deposited the draft in his checking account, waited until it had been collected, then drew out the cash, paid the bills ordered by the court and placed the balance in his safety deposit box in the same envelope with the Muckelroy money. It is unquestioned that he then had a balance of $1242.33, and it is certain that this balance was not invested as the court had ordered.

The next events occurred on December 24, 1959, when, by the guardian's version, she was summoned to respondent's office to receive some money. Respondent testified in one instance that he had called the guardian to his office, but in another that the guardian and minor came in and told him they wanted some Christmas money. In any event, the guardian was given respondent's personal check for $500 on that day and executed a receipt which described

such sum as "being payment of amount due under settlement" of the personal injuries case. Further, the receipt continued: "This also acknowledges that the total amount of settlement received is $3000.00, that expenses and fees are in the amount of $1757.77 leaving a balance of $1242.33 for distribution; that the Illinois Public Aid Commission claims this entire balance and that there remains after the payment to me of $500.00, the sum of $742.23 to apply to the claim."

Explaining the obvious deviation from the court's order that the balance of the settlement be invested in bonds, respondent testified that he had telephoned the county judge before paying the money to the guardian, and advised the latter that he recommended such a distribution should be made because he thought enough would be realized from the dramshop action, in which there had been an offer of settlement for $4500, to satisfy the claim of the commission. It nowhere appears that the county judge gave his approval to the proposal, but it is certain that a formal order authorizing the distribution to the guardian was never sought or obtained. The county judge was not called as a witness concerning the matter but, for our part, we cannot conceive that amendment to the prior distribution order was permitted in so casual and informal a manner, particularly when the funds belonging to a minor were involved.

On January 28, 1960, respondent had a conference with an official of the commission and was given a statement for the lien claim in the amount of $995 to which he said he objected because it duplicated some medical bills that had already been paid. At the hearing in this cause, the guardian admitted the validity of the lien. Subsequently, during February, 1960, respondent gave the minor $10 on two different occasions, and in January, 1961, when the guardian's brother-in-law sought him out to learn the status of the matter, respondent drew up a handwritten statement which showed that he had a balance of $722.23, and a no-

tation beside that figure stated: "Claimed by the State of Illinois." When this cause was heard late in 1961 respondent testified that the dramshop action had moved slower than expected, that he still had the $722.23, and that it was still in the envelope in his safety deposit box.

One cannot read the record without being convinced that respondent has been guilty of procrastination, delay and disobedience to the court order and that the Public Aid Commission lien is now sought to be used as a crutch to avoid the consequences. The order of November 12, 1959, directed certain bills to be paid and that the balance be invested in bonds. Had this been done the funds would have been preserved and earning interest, and would have been available in the guardianship estate if the commission had in fact taken steps to enforce its lien against the settlement. Yet we find respondent completely disregarding the court's order by first commingling the entire settlement in his personal chacking account and then by putting the $1242.23 balance after paying bills in his safety deposit box. The order in the guardianship proceeding was never modified and yet, six weeks later, respondent distributed $500 to the guardian for "Christmas money" and placed his client in jeopardy of contempt for having disobeyed the court's order. The receipt signed by the guardian on December 24, 1959, which we have no doubt was dictated by respondent, recites that the commission was claiming the entire $1242.43 balance, yet the proof here shows that respondent did not even ascertain the amount of the lien claim until January 28, 1960. Again the receipt is couched in terms that the $722.23 balance in respondent's hands after giving the guardian $500 would be "applied" to the commission's claim. This was never done or attempted, nor was such a disposition of the estate's assets ever formally taken up with the county court. Instead, in February, 1960, respondent continued his independent course and made two

more unauthorized distributions of the assets to the minor, after which he retained the money and did nothing. Such loose and careless handling of the client's money and total disregard for proper court procedures can hardly fail to bring the legal profession into disrepute and can neither be condoned nor permitted.

The next charge against respondent involved his representation of a Mr. and Mrs. Otto Ohmart, Illinois residents who had been injured in a Tennessee automobile accident. We see no beneficial purpose, however, in setting forth the proof relating to this charge in any detail. If the complainants are to be believed, respondent, through delay, neglect and deliberate misrepresentation, caused them to lose their causes of action. If respondent is to be believed he had terminated his relationship with the Ohmarts before the Tennessee period of limitation had run and the fault lay with an attorney in that State. The entire matter of unprofessional conduct under this specification thus resolves itself into a question of which witnesses were telling the truth, and we see no ground for substituting our judgment in such matter for that of the commissioners who had the advantage of seeing and hearing the witnesses testify. We would also add, as the commissioners found, that the most inexcusable and unprofessional aspects of respondent's conduct under this charge rest in the false and fraudulent representations he made to his clients to cover up and forestall discovery of his neglect.

The two remaining charges against respondent involve his conduct of refusing to return the papers and records of clients after he had been discharged. In one instance the refusal persisted for 15 months and although it is now urged that he had a possessory lien for fees, the record is devoid of any proof that he was then claiming a fee, or in fact had one coming. Moreover, at the hearing, the only explanation offered by respondent was "I wasn't in my

office very much then and it had slipped my mind." Under all of the circumstances we agree with the commissioners that his failure was wrongful and unprofessional.

Any conduct of an attorney which necessarily tends to bring discredit upon the profession is an abuse of the privilege secured to him by his license, (*In re Alschuler*, 388 Ill. 492,) and we find there has been satisfactory proof of such conduct on the part of the respondent in this case. The loose, careless and dilatory practices followed by respondent in matters entrusted to him, his failure to follow court orders, and his unorthodox methods of handling and accounting for funds entrusted to him, all were such as to bring the legal profession, the courts and the administration of justice into disrepute. The commissioners, on the record made, concluded that the total effect of all the proved charges was to demonstrate that respondent is altogether unfit for the practice of law and recommended his disbarment. We think the commissioners were warranted in so finding, and their report and recommendation are approved.

*Respondent disbarred.*