(No. 47588.—

*In re* DANIEL A. COSTIGAN, Attorney, Respondent.

*Opinion filed March 18, 1976.—Rehearing denied May 27, 1976.*

Francis X. Riley, of Chicago, for respondent.

John F. McCarthy, of Chicago, for *amicus curiae,* the Chicago Bar Association.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Division IV of the Committee on Grievances of the Chicago Bar Association, sitting as commissioners of this court under former rule 751 (Ill. Rev. Stat. 1969, ch. 110A, par. 751), recommended that respondent, Daniel A. Costigan, be disbarred. The full Committee on Grievances

concurred in that recommendation. The Board of Managers of the Association, however, reduced the recommended discipline to five years' suspension. The case comes to us on respondent's exceptions to that recommendation and his contention that suspension of a 68-year-old lawyer for five years is the equivalent of disbarment; that censure, on the facts of this case, constitutes a sufficient sanction.

Respondent was admitted to the Illinois bar in 1932 and has been an active practitioner in the same location in Chicago since that year. He served as a master in chancery in the circuit court of Cook County for some 26 years, handling more than one million dollars in that capacity. There had been no complaints of professional misconduct which reached the Grievance Committee prior to the acts hereinafter related.

John Peter Seltz (hereinafter referred to as Peter) was respondent's godson, and had been represented by respondent in a Massachusetts will construction case in the settlement of which Peter received three hundred thousand dollars. Thereafter the John Peter Seltz Trust was created pursuant to an agreement drafted by respondent. The trustees were John Peter Seltz, Jean Raymond Seltz, who was Peter's father, and respondent's wife, Eve Charles Costigan. Peter was named managing trustee, and gave respondent his power of attorney to "transact all of the business of the aforesaid Trust within the State of Illinois *** ."

The trust securities were kept in a "Securities Custody Account" at Northern Trust Company. Respondent dealt with the bank, attended to all other trust business and handled personal matters for Peter, who lived in California, spent some time in Switzerland where the family owned property, and occasionally visited in Chicago. In 1968, respondent testified, he borrowed $15,000 from Peter. In August of that year Peter asked for repayment since he needed the money to purchase land in California. Not

having the funds available, respondent forged the names of the three trustees to a note and documents necessary to secure a loan from Northern Trust and received a cashier's check payable to the trustees in the amount of $12,930.96. He then forged the endorsements of the trustees on the check, took it to the Civic Center Bank and received cash to which he added a sufficient amount of his own funds and repaid Peter. The forgeries were discovered by the trustees in September, 1969, when Peter and his father returned from Switzerland while respondent was away, went to the Northern Trust Company and learned of certain bank loans hereinafter described, one of which was then in default. The loss to the Civic Center Bank was paid by its bonding company, Aetna Casualty and Surety Co., subject to a $1,000 deductible clause. Respondent, unaware of the deductible clause, worked out with Aetna an agreement to reimburse it on a monthly installment basis. He later paid the bank its $1,000 loss after the bank had filed its complaint with the committee on November 3, 1971. That initial complaint concerned only this one transaction, as did the respondent's answer and all of the evidence at the March 2, 1972, hearing on that complaint. Respondent there testified in some detail, freely admitting his guilt, his humiliation at his misconduct and his determination that it would not happen again. He was not asked about, nor did he mention, any other loans. That hearing was continued to a later date to enable respondent to call other witnesses.

Prior to the adjourned hearing date counsel for the committee, in the course of verifying the restitution arrangements testified to by respondent, learned, apparently for the first time, that additional monies, bringing the total to $57,100, were obtained from Northern Trust Company in September, November and December, 1968. In those transactions letters of direction to the custodian of the trust securities to deliver certain of the securities as collateral, stock powers, Federal Reserve forms stating the

purpose of the loans was to purchase real estate, check endorsements and notes were all executed by signing the names of the trustees. Renewals were executed in March and May of 1969, and the interest on the loans was paid by respondent.

An amended complaint was then filed on April 13 alleging the additional misconduct. At the hearing thereon respondent admitted the additional transactions, stating that, as he recalled, the proceeds of all of the loans were used to repay Peter, to whom he had been indebted in a total amount of about $60,000. He did not recall specific details, testifying that he had not checked his records but would do so if the committee wished him to do so. His testimony indicated he had entered into an arrangement with the bank's insurer to repay the $57,000 and that $38,000 remained to be paid.

He explained the absence of any reference at the first hearing to the additional transactions by stating that he had not been asked about them. Later in the hearing the following occurred:

"CHAIRMAN SWEENEY: Since I raised this issue, Mr. Costigan, I would like to go into it with you. You are a man of longstanding in the legal community. At the last hearing you knew of these other transactions, did you not?

THE WITNESS: I did.

CHAIRMAN SWEENEY: And is it your testimony and your position now tonight that the only reason you did not raise them or mention them here is because you weren't asked?

THE WITNESS: I had considered talking to McBride [the committee secretary] about them because I have known McBride for a long time and he is a very fair and honest man. My position was that he was fair and honest with me; I should be with him. And I considered it a couple of times, I called him and we didn't get together.

But meanwhile he got the information himself so that I didn't have to give it to him; but I had considered it. I don't know you gentlemen, I know Mr. McBride. I'm not peddling him, but I know him.

CHAIRMAN SWEENEY: When did you consider telling Mr. McBride this additional information or this information—I'll strike the word additional,—before or after the first hearing?

THE WITNESS: After.

CHAIRMAN SWEENEY: But you knew this information the night of the first hearing?

THE WITNESS: Certainly.

CHAIRMAN SWEENEY: When you explained—I believe you told us as fully as you could what happened?

THE WITNESS: Yes, sir.

CHAIRMAN SWEENEY: Well, if you have anything else to say on that part of this case, I think I'd be interested in hearing it. I do not think it would be fair for me to ask you any more questions.

THE WITNESS: Well, all I can do is repeat what I said before. I gave great consideration to discussing the matter with McBride and telling him that there were other items, and I called McBride a number of times and he called me a number of times but it wasn't anything that I was rushing about. I was ashamed about it. But I thought I ought to tell him because he has a responsibility here which is continuous."

Respondent also testified that he did not tell his counsel of the additional loans.

Several substantial clients testified on respondent's behalf indicating he had represented them for years in transactions involving considerable sums of money, that respondent had told them of the disciplinary proceedings but that they still trusted him and that he still represented them. Affidavits were also introduced from two judges of the Cook County circuit court attesting to respondent's professional competence, good reputation and character and his service with distinction as a master in chancery of that court; from an osteopathic physician and surgeon and from a corporate officer, both stating their high opinion of respondent's character and ability, that he had informed them of the complaint against him and that he would continue to represent them and the company of which one affiant was secretary-treasurer.

Respondent also testified that the trust has been removed from Illinois and that he no longer acts as attorney for the trust or as agent for Peter, although the latter still calls him for information regarding California residents known to respondent.

The inference to be drawn from the record before us is that the members of the hearing panel had been favorably impressed at the first hearing with respondent's apparent frankness and candor in acknowledging his actions and categorizing his conduct as a mistake which would not happen again. It is also clear that, when the additional misconduct was made known at the outset of the hearing on the amended complaint, the panel's initial impression of respondent's candor and frankness was affected, as is apparent from the following comment by the chairman of the panel:

"CHAIRMAN SWEENEY: May I, perhaps, on behalf of the Commissioners respond to that? I believe, and we believe that there may be a change because we had it with considerable candor the admission by Mr. Costigan of one transaction here. We find out now there were several others which he never mentioned."

The findings of the panel that respondent's conduct has brought the legal profession into disrepute included a specific finding:

"24. Respondent has demonstrated a distinct lack of candor before the Commissioners by withholding evidence as to other loans which he knew full well he should disclose."

This paragraph was stricken from the report of the panel by the full Committee on Grievances in its order approving the panel's recommendation of disbarment.

Respondent suggests, in urging us to reduce the recommended discipline, that none of the trustees have filed complaints against him and that, had respondent known of the bank's $1,000 loss and repaid it before the bank filed a complaint, no disciplinary proceedings would

have ensued. Whether others would have complained, had the bank not done so, is in our judgment speculative and not particularly relevant to the disposition of the case.

Counsel for respondent has characterized the recommendation of "the Draconian penalty of disbarment" by the hearing panel as an "over-reaction" by the panel resulting from the "indignation of the Chairman" at the nondisclosure during the first hearing of the full extent of the misconduct. We believe the criticism unfair to the chairman and panel members. Respondent himself was more sensitive to the problem and recognized that the impression of total candor which he seemed to be conveying at that hearing was incompatible with the actual facts; that there is a considerable difference between a single episode and a series of such episodes; and that his explanation of one transaction as a means of repaying a loan of $15,000 varied substantially from his later explanation of at least four transactions to repay a total indebtedness of $60,000.

There exists no substantial dispute as to the facts; nor is there dispute that respondent was guilty of serious breaches of his professional responsibilities and a lack of fidelity to private trust which tended to bring the legal profession into disrepute. (*In re Fumo* (1972), 52 Ill.2d 307, 311.) The conduct here involved is of a type which this court has always considered as warranting substantial sanction (*In re Wyatt* (1972), 53 Ill.2d 44, 45), and the censure suggested by respondent as adequate in this case does not merit serious consideration. In fulfilling our obligation to protect the public by maintaining the standards of the legal profession, however, we must not overlook considerations of fundamental fairness to the respondent. *In re Di Bella* (1974), 58 Ill.2d 5, 8; *In re Sullivan* (1965), 33 Ill.2d 548, 556.

There is to be considered in mitigation the facts that respondent, for some 44 years, has been an able, well-regarded lawyer, practicing alone and at the same location.

During that period he creditably served some 26 years as a master in chancery of the circuit court. There have been no disciplinary proceedings against him except for the course of conduct involved here. When questioned regarding the conduct alleged, he frankly admitted it. Although his failure to mention the additional, uncharged misconduct is understandable, it certainly is not commendable where the uncharged conduct is as interwoven with the charged conduct as is true here. While respondent's conduct involved numerous instances of deliberate forgery, full restitution has been made and respondent seems truly ashamed and repentent.

Determination of the precise discipline to be imposed upon an erring attorney is rarely easy. It is not easy here. A majority of the court is of the opinion that suspension for a period of two years is an appropriate sanction. Mr. Justice Schaefer, Mr. Justice Ryan and I would approve the recommendation of the Board of Managers.

*Respondent suspended.*