(No. 54243.—

*In re* ARTHUR H. GRANT, Attorney, Respondent.

*Opinion filed February 19, 1982.—Rehearing denied March 25, 1982.*

MORAN, J., dissenting.

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, of William J. Harte, Ltd., of Chicago (David J. Walker, of counsel), for respondent.

JUSTICE UNDERWOOD delivered the opinion of the court:

In these consolidated disciplinary proceedings the Review Board of the Attorney Registration and Disciplinary Commission has recommended that respondent, Arthur H. Grant, be suspended from the practice of law for a period of three years and until further order of the court. The matter is before us on respondent's exceptions to that recommendation.

Separate complaints were filed by the Administrator and heard by separate panels. The first complaint, filed on December 19, 1978, charged respondent in separate counts with the commingling and wrongful conversion of client funds belonging to Edward A. Washington and Leroy Brawner and a failure to promptly pay to them monies to which they were entitled, all in violation of Canon 9 DR 9—102(B)(4) and Canon 1 DR 1—102(A)(4) of the Illinois Code of Professional Responsibility as approved and adopted by the Illinois State Bar Association (1977). (See 84 Ill. 2d Rules 9—102(c)(4), 1—102(a)(4).) A subsequent amendment added a count containing similar allegations as to funds belonging to Leroy Jackson. The second complaint, filed in March 1980, charged conversion of the funds of Herbert Brock, Annie Bright and Arvilla Donald.

Respondent was admitted to practice in Illinois in 1954. The complaints arise from his handling of money received as settlement of four separate cases during 1977-78. Respondent maintained several bank accounts in different banks during this period. Some of the accounts were designated trust accounts; however, he used all of them for personal and business purposes as well as for clients' funds. Bank statements indicate that several of these accounts,

among them those in which complainants' funds were placed, were overdrawn on several occasions.

In June 1977, respondent received a check in settlement of Edward Washington's personal injury claim and deposited it in a "trust account." In September, respondent issued a check for $980.67 to his client, which represented his share. That check was returned due to insufficient funds. Later that month respondent issued a replacement check drawn upon a different bank which was honored upon presentation. The "trust account," which was also used by respondent for his personal and business expenses, had been overdrawn several times between the end of July and the end of September.

In September 1977 respondent received a check in settlement of a personal injury claim he had filed on behalf of Leroy Brawner. He had his client endorse the draft on September 22 and told him he would receive his money in about two weeks. The client testified that in mid-November he made several calls and one trip to respondent's office but never was able to talk to or see respondent. On December 1, respondent cashed the check. Mr. Brawner testified that he talked to respondent in December about the check and was told that the check had not cleared. Respondent denies that this conversation occurred. On January 9, 1978, the client filed a disciplinary complaint. Respondent's secretary testified that in January and February she made several unsuccessful attempts to contact Mr. Brawner, and that on March 7 the client's money was paid in cash at respondent's office from money taken from an envelope in the client's file. Respondent testified that for a time that file could not be found but the cash had been in it since December. He also testified that the client had expressed a preference for being paid in cash.

Around November 5, 1978, respondent received a check in settlement of a claim filed on behalf of Leroy Jackson.

Mr. Jackson endorsed the draft and respondent deposited it in a "trust account." This account was also used by respondent for business and personal expenses as well as to cover overdrafts from another account. Because of his inability to obtain his money from respondent, Mr. Jackson retained another attorney to represent him in his collection efforts and to pursue another matter for which respondent had previously been engaged. Respondent claimed that his client owed him for services on the other case and that negotiations broke down when the client's new attorney refused to accept the check less those fees. The client filed a complaint with the Commission in December 1978, and, on advice of counsel, respondent sent the settlement funds in the amount of $4,600 to Mr. Jackson the following June, withholding only "out-of-pocket expenses and fees" in connection with the settled claim. The balance of the account in which these funds had been held had on several occasions between November 1977 and June 1979 fallen below the amount owed Mr. Jackson.

In April 1977, respondent received checks in settlement of accident claims filed on behalf of Annie Bright, Arvilla Donald, and Herbert Brock. These checks were endorsed by respondent through a power of attorney and cashed by him on July 10. In April 1978, Herbert Brock learned from the insurance company that the case had been settled and called respondent about the money. Respondent issued him a check for $783.28, which was returned because of insufficient funds. A replacement check was issued immediately and honored. In December, respondent was contacted by Mrs. Walton, a Chicago relative of out-of-State clients Annie Bright and Arvilla Donald. Mrs. Walton complained that the clients had not been paid, and was told by respondent that he would mail them a check. Subsequently Mrs. Walton complained to the Chicago Bar Association, a representative of which wrote to respondent but received

no response, and the matter was referred to the Commission. After the complaint was filed, respondent paid the clients, through Mrs. Walton, their shares of the settlement, $101 each. Respondent testified, and supported by affidavit filed after the hearing, that a former secretary had been given cash to purchase money orders for these clients but that she failed to do so and instead converted the money to her own use and hid the files.

Six attorneys, including past and present presidents of the Cook County Bar Association, testified as to respondent's long involvement in community activities and *pro bono* work for indigents. That testimony also established that respondent had received from the Cook County Bar Association its Westbrook award, which was one of four awards given annually to its outstanding members.

The panel which heard the complaint concerning the transactions with Washington, Brawner, and Jackson found that respondent had improperly commingled funds and, with respect to Washington and Jackson, had committed a "technical conversion" when the balance of the trust accounts fell below the amount owed these clients. The panel found "no evidence of dishonest motive" and noted that "respondent's difficulties [arose] from extremely sloppy bookkeeping practices and a failure to properly communicate with clients * * *." The panel noted the testimony of the character witnesses earlier referred to and recommended respondent's censure.

The panel hearing the complaint concerning Bright, Donald and Brock did so some nine months after the first hearing. Respondent was served with the complaint on April 7, 1980, but failed to answer or in any way respond thereto prior to the hearing, although he had earlier responded to a letter of the Commission in August 1979, by enclosing a letter from Mrs. Walton, dated August 16, 1979, stating that she had received payment from respondent and

requesting that the complaint be dismissed. Respondent appeared at the hearing without counsel and requested a continuance so that he might be represented. Since it appeared that respondent had not contacted his attorney until just a few days before the hearing, the panel denied this motion and ruled that the allegations of the complaint be deemed admitted because of the failure to answer. Respondent testified in his own behalf but presented no character witnesses as he had in the former hearing. This panel found that respondent's acts constituted conversion of clients' funds in violation of DR 9—102(B)(4) of the Illinois Code of Professional Responsibility (Illinois State Bar Association 1977), which conduct was "unethical, unprofessional and tends to bring the courts and the legal profession into disrepute." It was recommended that he be suspended for three years and until further order of the court.

The Review Board majority, emphasizing that far more occurred here than just the "technical commingling and a technical conversion of the client's funds" as the panel hearing the matters concerning Edward A. Washington *et al.* characterized the conduct in that proceeding, stated that it was "only with great reluctance" that it recommended the three years' suspension rather than the disbarment which two members of the Board considered appropriate. It aptly described what occurred here:

"In each of the cases, funds of the client were not delivered to the client when they should have been or when they were requested. In each of the cases, the funds were, in fact, put to the attorney's own use so that when asked he was unable to comply with his client's demands to pay over funds rightfully due the client.

Furthermore, in our review, the record clearly establishes that these are not isolated examples of missed communications and oversights but, rather, represent an established standard of practice engaged

in by the Respondent. That his conduct clearly violates Canon D.R. 9—102(A)(2), (B)(4) is beyond dispute. Nor can it be disputed that the conduct of the Respondent is the type calculated to bring disrepute upon the law and the profession.

The loose, careless and dilatory practices followed by the Respondent in the handling of an accounting for, or more accurately, the failure to account for funds entrusted to him is clearly an abuse of the privilege secured to him by his license * * *."

Given the frequency with which this court has emphatically and unequivocally condemned the commingling of clients' funds with the attorney's own (*e.g.*, *In re Clayter* (1980), 78 Ill. 2d 276, 278-79. See also, *In re Schlax* (1980), 81 Ill. 2d 66; *In re Brody* (1976), 65 Ill. 2d 152; *In re Sherman* (1975), 60 Ill. 2d 590; *In re Bloom* (1968), 39 Ill. 2d 250; *In re Lingle* (1963), 27 Ill. 2d 459), it seems incredible that the practice persists. As was pointed out in *Clayter* (78 Ill. 2d 276, 281), commingling is frequently the first step toward conversion. Too, in case of death or insolvency of the lawyer, client funds commingled with his own may well become assets of the lawyer's estate, relegating the rightful owner of the funds to the status of a general creditor. The hazards involved in commingling, coupled with the actual conversion of funds occurring here, render explanations such as "poor bookkeeping," "failure to fully understand the duty" and "no dishonest motive" completely unacceptable.

During 1977 and 1978 bank statements indicate that the accounts used by respondent for clients' funds were overdrawn on numerous occasions. Twice respondent gave checks to clients which were returned due to insufficient funds. Several times payments to clients were inexplicably and inexcusably delayed—six weeks elapsed between the time Washington endorsed his check and respondent issued a check which was returned for insufficient funds, and 10 months elapsed between the time respondent received

Brock's settlement check and respondent issued a check which was also returned because of insufficient funds. Leroy Brawner secured payment of his settlement proceeds only after some 15 months' delay and a complaint to the Commission; Leroy Jackson was paid his workers' compensation settlement only after employing counsel to collect from respondent. More than 1½ years' delay intervened between receipt by respondent of the settlement drafts for Annie Bright and Arvilla Donald and his payment to them. Respondent ignored calls and letters from his clients and the Chicago Bar Association, and he failed to answer the complaint in the Brock inquiry. Carelessness, sloppy bookkeeping, overwork, or poor staff cannot excuse this type of conduct; rather, these factors, even where no dishonest motives exist, tend to bring the entire profession into disrepute.

Respondent concedes that he has commingled funds and has "technically" converted clients' funds, but he urges that because of his previously unblemished record, his strong character references, and his significant history of community service and *pro bono* work, a sanction of three years' suspension is too harsh a penalty, particularly since neither hearing panel found dishonest motives and all clients were paid what was due them.

A determination that the conduct which occurred here requires discipline is considerably less difficult than the determination of the nature and extent of that discipline. Our cases involving commingling or commingling and conversion reveal disciplinary action ranging from disbarment (*In re Snitoff* (1972), 53 Ill. 2d 50; *In re Lingle* (1963), 27 Ill. 2d 459) to censure (*In re Clayter* (1980), 78 Ill. 2d 276), depending upon the circumstances of the individual case. Considering our obligation to protect the public and insure the integrity of the profession (*In re Snitoff*) in light of the evidence establishing a pattern of repeated commingling and conversion of funds, we believe suspension for

two years is appropriate. We do not consider necessary, however, the additional provision recommended by the board that suspension continue until our further order, a condition generally reserved for those situations where the disciplined attorney is emotionally unstable. *In re O'Hallaren* (1976), 64 Ill. 2d 426, 434.

*Respondent suspended.*

JUSTICE MORAN, dissenting:

In attorney disciplinary cases, this court has consistently reiterated the statement made in *In re Andros* (1976), 64 Ill. 2d 419, 425-26: "While a degree of uniformity in the application of attorney discipline is desirable, each case must still be determined on its own merits." Although this court has held that the doctrine of *stare decisis* cannot be applied to the specific discipline meted out in any particular case (*In re Nesselson* (1966), 35 Ill. 2d 454, 461), I fear that, too often, principles of uniformity are unduly minimized. Certainly the circumstances of each case should be taken into account. However, it is imperative that consistency be established to assure imposition of like sanctions under similar circumstances. For, as this court has also stated: " '*** The courts must not exercise their supervisory control [over the legal profession] in an arbitrary manner, but must show a legal discretion in the exercise thereof. [Citation.]' " *In re Alswang* (1978), 71 Ill. 2d 203, 209, quoting *In re Donaghy* (1948), 402 Ill. 120, 123.

A review of this court's decisions in disciplinary cases demonstrates a lack of consistency in the sanctions imposed. Cases involving apparently similar misconduct have resulted in sanctions ranging from censure to disbarment.

For example, in *In re Clayter* (1980), 78 Ill. 2d 276, an attorney commingled and converted $1,000 that he held as earnest money for the parties to a real estate trans-

action. The court considered a number of mitigating circumstances and concluded that censure would be an appropriate sanction. Yet, in *In re Agin* (1970), 45 Ill. 2d 126, where the attorney settled a personal injury claim and failed to remit the proceeds to his client until demanded, the court ordered him suspended for one year. Although the court considered mitigating circumstances, it determined that respondent's misconduct warranted stern discipline.

In *In re Melin* (1951), 410 Ill. 332, the attorney converted and commingled funds from two estates, and was grossly negligent in the performance of his duties. Noting only the attorney's good reputation, the court ordered that he be censured and suspended from the practice of law for three months. Similarly, in *In re Borchardt* (1934), 357 Ill. 458, the attorney commingled and converted the funds from two estates, yet he was suspended for two years and until such time as complete restitution was made. This sanction was imposed despite the court's consideration of numerous mitigating factors, such as the attorney's long and honorable career at the bar, the fact that he intended to make complete restitution, and his candor in admitting the wrong committed.

In *In re Callas* (1980), 82 Ill. 2d 6, an attorney, in his capacity as head of the corporate trust department of a bank, authorized a $25,000 advance to a corporation that furnished computer services to the bank. At the time of the loan, the attorney was personally indebted to the corporation for that $25,000 amount. Respondent pleaded guilty to Federal charges of embezzlement and conversion. This court found that the misapplication and conversion of $25,000 was a serious violation of important professional responsibilities with which respondent had been entrusted. The court did not discuss factors mitigating the misconduct, and suspended the attorney for nine months. Yet, in *In re Patt* (1980), 81 Ill. 2d 447, an attorney was con-

victed of the Federal offense of embezzlement. This court stated, "The embezzlement or conversion of a client's funds is an act involving moral turpitude and is a gross violation of the attorney's oath which warrants disbarment in the absence of mitigating circumstances." (81 Ill. 2d 447, 453, citing *In re Stillo* (1977), 68 Ill. 2d 49, 54.) The court noted that because respondent offered no evidence before the Hearing Board, the record disclosed no facts sufficient to mitigate the seriousness of respondent's offense. The attorney was disbarred.

Apparently, inconsistent sanctions are in some instances attributable to recognition of various factors mitigating an attorney's misconduct. However, a review of the cases illustrates the uneven and arbitrary application of the mitigating factors. Two factors often advanced by a respondent in mitigation are financial and emotional or family problems. In *In re Smith* (1976), 63 Ill. 2d 250, an attorney converted proceeds from a client's settlement award to his own personal use. He offered evidence in mitigation to the effect that he suffered severe financial and emotional problems during the time of the alleged misconduct. In ordering that the attorney be disbarred, this court indicated that personal difficulties would not excuse the misconduct. This court, in other disciplinary cases involving conversion, has recognized that personal problems would not excuse the attorney's actions, and ordered suspension. (*In re Simpson* (1971), 47 Ill. 2d 562; *In re Abbamonto* (1960), 19 Ill. 2d 93.) However, in still other cases involving conversion, this court has used personal or domestic difficulties as a mitigating circumstance in arriving at a sanction of suspension. (*In re Driscoll* (1981), 85 Ill. 2d 312; *In re Bass* (1971), 49 Ill. 2d 269). In *Bass*, family problems (along with an impressive war record) were allowed as mitigation resulting in a one-year suspension even though, in addition to conversion, the attorney failed to prosecute suits, failed to notify a

client he had not filed suit in a case, and was convicted for income tax evasion. In yet other cases, not involving conversion, this court has considered family or emotional problems as a mitigating circumstance reducing the sanction imposed. *E.g., In re Hopper* (1981), 85 Ill. 2d 318; *In re Chapman* (1978), 69 Ill. 2d 494; *In re Andros* (1976), 64 Ill. 2d 419.

Another area of inconsistency has arisen in the court's approach toward restitution as a mitigating circumstance. In a number of cases, restitution of converted funds has been expressly or implicitly considered as a factor mitigating the seriousness of an offense. (See *In re Costigan* (1976), 63 Ill. 2d 230; *In re Bloom* (1968), 39 Ill. 2d 250; *In re Power* (1950), 407 Ill. 525.) For example, in *In re Turner* (1979), 75 Ill. 2d 128, an attorney, without authorization, signed the names of three clients on the back of a settlement check for $850, deposited the check in his personal account, and subsequently overdrew the account. He did not pay the clients until one day prior to the scheduled hearing before the Inquiry Board. In addition, the attorney gave false testimony before the Board. This court compared the case to *In re Stillo* (1977), 68 Ill. 2d 49 (where this court disbarred an attorney, who was dishonest before the Hearing Board, for commingling and converting funds) and suspended Turner for three years. The court noted his prior unblemished record and that he had made restitution to the parties. In *In re Smith* (1979), 75 Ill. 2d 134, respondent was charged with three separate instances of endorsing a client's name on a check, depositing the check in his own account, and using the funds for his own purpose. The attorney made false representations to the clients regarding the money. This court held that the respondent's acts, together with the absence of attempts at restitution, candor or remorse, warranted respondent's disbarment.

In contrast, some cases specifically indicate that restitution will not excuse the improper conduct. (*In re Feldman* (1982), 89 Ill. 2d 7; *In re Sherman* (1975), 60 Ill. 2d 590.) In other cases, this court has distinguished between the effect of restitution made prior or subsequent to the initiation of a complaint. (See *In re Brody* (1976), 65 Ill. 2d 152; *In re Smith* (1976), 63 Ill. 2d 250.) In still other situations attempts at restitution were not considered by the court in imposing a sanction. *In re Cleveland* (1981), 85 Ill. 2d 520; *In re Stillo* (1977), 68 Ill. 2d 49.

Another factor accorded inconsistent treatment by the court is the prior record of an attorney against whom a complaint has been brought. In *In re Clayter* (1980), 78 Ill. 2d 276 (discussed above) and *In re Sherman* (1975), 60 Ill. 2d 590, attorneys were guilty of commingling and converting their clients' funds. This court determined that censure was a sufficient sanction, partly because the attorneys were not cited for misconduct prior to the incidents in question. In *In re Schlax* (1980), 81 Ill. 2d 66, where an attorney commingled and converted funds in a single instance, this court, taking into consideration character testimony, community service and otherwise exemplary professional conduct, suspended respondent for three months. Yet, in *In re Gartland* (1970), 47 Ill. 2d 177, this court refused to consider the fact that the incident was the first misconduct by the attorney, who converted funds of a savings and loan institution. In imposing a one-year suspension, this court indicated it was not persuaded by the attorney's previously unblemished record because the first purpose of a disciplinary proceeding is "to safeguard the public, maintain the integrity of the profession and to protect the administration of justice from reproach." 47 Ill. 2d 177, 183.

Finally, a deviation occurs even in the court's treat-

ment of the principle that an exemplary record generally inures to the attorney's benefit while other prior disciplinary action, if considered, is to his detriment. For in *In re Baker* (1973), 55 Ill. 2d 272, this court actually used a prior sanction as a mitigating circumstance. The court held that an attorney's misconduct warranted censure, rather than suspension, because "the conduct of the respondent which was the ground for his suspension for one year in 1967 was more reprehensible than the 1964 conduct now complained of and for which the Board advises a two-year suspension." 55 Ill. 2d 272, 274.

Notwithstanding the inconsistencies in the above-discussed disciplinary cases, I discern one relatively clear pattern. Continuing conduct involving commingling and conversion generally warrants an attorney's disbarment. Therefore, in the instant case, where the majority acknowledges that respondent's conduct involved "a pattern of repeated commingling and conversion of funds" (89 Ill. 2d at 254-55), I believe a sanction of disbarment is appropriate.

In several cases, conduct similar to or less egregious than that which occurred here has resulted in an attorney's disbarment. For example, in *In re Feldman* (1982), 89 Ill. 2d 7, decided this same term, we ordered disbarment of the attorney for converting estate funds of two clients to his own personal use. In so holding, we noted that the wrong committed did not involve an isolated incident. Rather, as in this case, respondent there "manifested a pattern of behavior which clearly tends to bring the legal profession into disrepute." (89 Ill. 2d 7, 13.) Further, the respondent here converted the funds of six clients, and therefore his conduct is arguably more severe than that involved in *Feldman*. Although mitigating circumstances were urged by the respondent in this case, there is no indication that they were considered by the court.

Similarly, in *In re Smith* (1979), 75 Ill. 2d 134, the attorney was disbarred for the wrongful conversion of clients' funds. In that case, respondent received settlement or judgment checks to which his clients were entitled. He forged their endorsements on the checks, deposited them in his bank account, and converted the proceeds to his own use. In imposing the sanction of disbarment, the court considered the fact that respondent was guilty of three independent acts of conversion. Although the court notes other aggravating circumstances (misrepresentations to his clients, lack of candor, and no attempt at restitution), the attorney in the instant case also did more than commingle and convert funds. He avoided communication with his clients and, as noted by the Review Board, engaged in "loose, careless and dilatory practices." (See 89 Ill. 2d at 253.) Further, as the majority indicates, respondent's explanations for his conduct are "completely unacceptable" (89 Ill. 2d at 253), and consequently his candor is questionable.

In *In re Stillo* (1977), 68 Ill. 2d 49, the attorney was charged with converting his client's funds, in that he settled her claim and failed to submit to her the proceeds of the settlement. He also borrowed $10,000 from another client which he failed to repay. On the basis of respondent's deceptive attitude before the Hearing Board, and these two instances of misconduct, only one of which involved conversion, this court ordered that the attorney be disbarred. Similarly, this court in *In re Smith* (1976), 63 Ill. 2d 250, determined that disbarment was an appropriate sanction for an attorney who converted to his own use the proceeds of his client's settlement award. This discipline was imposed despite respondent's assertions of mitigating circumstances, and the fact that he extracted money from only one client.

In *In re Frey* (1976), 65 Ill. 2d 130, an attorney was disbarred for commingling and converting his clients'

funds, which conduct, as in this case, "extended over a considerable period of time." (65 Ill. 2d 130, 131.) The court further indicated that respondent falsely advised his clients with respect to the status of their claims. Similarly, in the instant case, the attorney misrepresented to at least one client that he would receive his money in about two weeks. Two months later, the client still had not received the sum to which he was entitled. Further, two clients received checks from respondent which were subsequently returned for insufficient funds. As this court stated in *In re Frey* (1976), 65 Ill. 2d 130, 131-32, the attorney's misconduct did not involve "merely negligent acts but are positive acts of misconduct which require disbarment."

Although these cases alone indicate that the disbarment of respondent is clearly warranted, there are numerous other cases to the same effect. (See, *e.g., In re Fumo* (1972), 52 Ill. 2d 307; *In re Snitoff* (1972), 53 Ill. 2d 50; *In re Lingle* (1963), 27 Ill. 2d 459; *In re Patlak* (1938), 368 Ill. 547.) As this court stated in *In re Stillo* (1977), 68 Ill. 2d 49, 54: "When a lawyer *** converts a client's funds to his own personal use he commits an act involving moral turpitude, and, in the absence of mitigating circumstances, such conversion is a gross violation of the attorney's oath, calling for the attorney's disbarment." (*In re Royal* (1963), 29 Ill. 2d 458, 464; *In re Ahern* (1962), 26 Ill. 2d 104, 110.) Any mitigating factors urged in the instant case, as in *In re Feldman,* cannot possibly alleviate the attorney's repeated and grievous departures from his ethical and professional obligations.

In summary, based upon the above cases, I believe the appropriate sanction here is disbarment, rather than the suspension ordered by the majority. I reaffirm my view that although it is necessary to consider the facts and circumstances of each case, that proposition should not be used as an aegis to attenuate the always strived-for goal of consistency.