(No. 55041.—

*In re* JOHN A. KESLER, Attorney, Respondent.

*Opinion filed February 19, 1982.*

Philip Schickedanz, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

Robert B. Oxtoby, of Van Meter, Oxtoby & Funk, of Springfield, for respondent.

JUSTICE UNDERWOOD delivered the opinion of the court:

This reciprocal disciplinary action under our Rule 763 (73 Ill. 2d R. 763) was initiated by the Administrator of the Attorney Registration and Disciplinary Commission as a

consequence of the disbarment by the Indiana Supreme Court of respondent, John A. Kesler. The Hearing Board provided in our disciplinary system (73 Ill. 2d Rules 751 through 771), apparently believing Rule 763 required discipline identical to that imposed by the sister State except in unusual circumstances not present here, recommended disbarment. That recommendation was affirmed by the Review Board.

In relevant part Rule 763 states:

"If an attorney licensed to practice law in this State and another State is disciplined in the foreign State, he may be subjected to the same discipline in this State, to run concurrently with the discipline in the foreign State, upon proof of the order of the foreign State imposing the discipline.

The Administrator shall initiate proceedings under this Rule by filing a petition with the court, to which a certified copy of the order of the foreign State is attached, together with proof of service upon the attorney. Within 21 days after service of a copy of the petition upon him the attorney may request in writing a hearing on the petition. The hearing shall be held before the Hearing Board no less than 14 days after notice thereof is given to the attorney respondent and the Administrator. At the hearing the attorney may be heard only on the issues as to (1) whether or not the order of the foreign State was entered; (2) whether it applies to the attorney; (3) whether it remains in full force and effect; (4) whether the procedure in the foreign State resulting in the order was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process of law; and (5) whether the conduct of the attorney warrants substantially less discipline in this State."

It has been stipulated by the parties that in all significant respects the Indiana and Illinois disciplinary rules are identical. Respondent's sole contention is that substantially less

discipline is warranted in Illinois than was imposed in Indiana.

We believe it apparent that Rule 763 does not require an automatic imposition in Illinois proceedings of the same discipline imposed by the State in which the misconduct occurred or in which prior ·disciplinary action had been taken. We think this intent appears from the language of the rule that "he [the attorney] *may* be subjected to the same discipline in this State" (emphasis added) and the provision in clause (5) permitting the respondent to urge that his conduct "warrants substantially less discipline in this State." Clearly clause (5) would be meaningless if the rule required imposition of the same discipline imposed in the other jurisdiction. That a particular sanction has resulted in the sister State from the same conduct is persuasive of the propriety of that sanction, but it is not binding, and our adjudicatory bodies may recommend, and we may impose, different discipline where analysis of the evidence compels such result. No other interpretation can be placed upon our opinion in *In re Neff* (1980), 83 Ill. 2d 20, in which both the dismissal recommended by the Review Board and the action taken by us differed from the discipline recommended in Wisconsin, the originating State. This is not to indicate, of course, that the factual findings in the Indiana proceedings may now be disputed, for they, like the finding of guilt in a criminal case upon which subsequent disciplinary proceedings are ·based, are *res judicata.* (*Neff; In re Cook* (1977), 67 Ill. 2d 26, 32; *In re Andros* (1976), 64 Ill. 2d 419, 423.) We turn, then, to a consideration of the evidence before us.

Respondent is a native of Clark County, Illinois, where many of his relatives still reside. He attended law school in Indiana and was admitted to both the Indiana and Illinois bars in 1951. He practiced as a sole practitioner, principally in Terre Haute, Indiana, and five Illinois counties on or near the Indiana border, doing considerable trial work in per-

sonal injury, criminal and divorce cases. While he handled other matters, including some probate cases, he had very few estates as large as the Grammer estate, in the administration of which the misconduct occurred. He had served two terms as a representative in the Indiana legislature and had been an unsuccessful candidate for judge. At the time of the Indiana disciplinary hearings he was the Democratic candidate for the State senate in a heavily Democratic district. He attributed his defeat to publicity resulting from the fact that the hearing officer at the supposedly confidential disciplinary proceedings permitted the news media and photographers to "invade" the hearing room.

The misconduct facts as testified to in the Illinois proceedings are apparently substantially as testified to in the Indiana proceedings and are summarized in the opinion of the Supreme Court of Indiana, from which we quote:

"On April 2, 1973, the Respondent and John L. Smith ('Smith') were appointed CoExecutors of the Last Will of Elsie M. Grammer. Respondent was also the attorney for the Estate. The Co-Executors qualified, gave their joint and several surety bond in the sum of $75,000, and commenced the administration of the Estate. The will provided a $1,000 cash bequest to the testatrix's cousin, James Edward Smith, and the rest, residue and remainder was given and bequeathed to Smith. The estate consisted of real and personal property having an approximate value aggregating in excess of $100,000.

Smith desired a partial distribution of his share prior to the closing of the Estate in order to purchase a residence for himself and requested Respondent on several occasions to provide the partial distribution. The Respondent advised Smith in substance that no partial distributions would or could be made within six (6) months of the opening of the Estate because such was the period of time within which claims or a will contest could be filed. After six (6) months, Smith

again requested the Respondent to permit a partial distribution to Smith of $45,000.

Respondent was concerned about his personal liability to taxing authorities in the event distributions to Smith rendered the Estate unable later to discharge then unforeseen tax liabilities and in the event a recovery from Smith could not be made. The Estate was solvent, but Respondent had information that the deceased had been 'generous' to Smith before her death and the Respondent thought that additional tax liability to the Estate could arise from predeath transfers.

Respondent consulted a Terre Haute CPA for advice and was told that, conceivably, the Respondent could incur some personal responsibility by making a premature distribution before the receipt of final tax clearances. Respondent informed the CPA that Respondent was considering an arrangement whereunder a portion of the distribution would be placed with the Respondent in escrow, so that the Respondent would be held harmless if the Estate was financially unable to pay potential tax claims due to a deficiency in estate funds created by the advance distribution. The CPA advised the Respondent that the escrow proposal sounded like an excellent and proper way to handle the matter.

In October, 1973, Respondent and Smith again discussed the partial distribution desired by Smith. Following this discussion a 'Petition for Partial Distribution' was filed in the Vigo Circuit Court. The petition, *inter alia,* stated as follows:

'That said John Smith has an urgent need for part of the money coming to him and is desirous of having $45,000.00 of his bequest paid over to him at this time as partial distribution of what he'll have coming at the close of this estate, and no possible hazard or danger could come to any creditor, devisee or anybody by him receiving this money at this time.'

There was no mention in the petition of any escrow agreement. The Court approved the partial distribution. At the time this pleading was filed, the Respondent was serving as Probate Commissioner of the Vigo Circuit Court.

The partial distribution of $45,000 was drawn by the Co-Executors in two checks payable to Smith, one for $30,000 and the second in the amount of $15,000. Smith kept the $30,000 check but returned the $15,000 check to the Respondent after endorsement. The Respondent either deposited the $15,000 in his personal checking or savings accounts, purchased bonds or other investment paper, or otherwise utilized the proceeds as his own. By the Respondent's own admission, he considered the funds his own to do with as he pleased, subject only to a claimed escrow arrangement and to his duty to repay the principal amount of $15,000 to Smith at the time of final distribution of the Estate.

Thereafter, three (3) additional partial distributions were made to Smith by the Co-Executors without petition or court order. The dates of such distributions, and the amount of each, were as follows:

| Date | Amount |
| --- | --- |
| February 21, 1974 | $ 7,500.00 |
| May 23, 1974 | 15,000.00 |
| May 8, 1975 | 15,000.00 |

On the occasion of each additional partial distribution, the Respondent obtained from Smith one-third (1/3) of such distribution. As in the case of the initial distribution, the Respondent did not recall, nor was he able to reconstruct from his records, what he did with the additional $12,500 he received from Smith between February 21, 1974, and May 8, 1975. He either deposited such monies in his personal checking or savings accounts, purchased bonds or other investment paper, or otherwise utilized the monies as his own. By May 8, 1975, the Respondent had obtained from Smith a total

of $27,500. At no time did Smith know of, or inquire into, the whereabouts of any of the funds (or their proceeds) he had given the Respondent at the time of the various partial distributions.

There was substantial delay in closing the Estate. The Final Report was eventually filed on November 19, 1975, and set for hearing on December 10, 1975. Smith appeared at the scheduled hearing and, with the help of the then Probate Commissioner, filed his sworn objections to the Final Account wherein he stated that he had received only two-thirds (2/3) of the amounts for which he had given the Respondent receipts. A hearing on Smith's objections to the Final Report was scheduled for January 8, 1976. However, on December 17, 1975, Smith and the Respondent appeared before the Judge of the Vigo Circuit Court and filed a 'Verified Stipulation of Facts and Dismissal of Objection to Final Report' which had been authored by the Respondent. On the same day, Smith received from the Respondent the sum of $27,500, the principal amount paid by Smith to the Respondent out of Smith's partial distributions." *In re Kesler* (1979), ___ Ind.___, ___, 397 N.E.2d 574, 577-78.

The Indiana court stated that respondent's failure to include any mention of the escrow agreement in the petition for partial distribution filed in the Vigo County circuit court constituted a "misrepresentation" to that court. In his Illinois testimony respondent stated that he had disclosed to the Vigo circuit court the details of the escrow arrangement during the hearing on the petition "as the transcript here shows without contradiction, exactly what his and my arrangement was. It suited the judge and it suited John Smith and we handled it exactly that way." The "transcript" referred to apparently was of the Indiana disciplinary proceedings, copies of which both counsel had and offered to the hearing panel. The panel declined to admit the transcript, however, presumably because of its belief that it

had no discretion as to the disciplinary sanction. Consequently we can only assume that the absence of any attempt to impeach respondent's Illinois testimony regarding disclosure to the court indicates its compatibility with his Indiana testimony. We mention this, not in criticism of the finding of misrepresentation by the Supreme Court of Indiana, but only because we believe respondent's oral explanation to the court mitigates its absence from the petition. Respondent testified that the escrow agreement was in writing and signed only by him. While he had given John Smith a copy, the latter did not recall receiving it when he testified in the Indiana proceedings. The transcript of those proceedings apparently contained a copy of the agreement.

Respondent also testified here that his annual income was in excess of $100,000 at the time of these events, and there was evidence that his net worth at the time of the hearings exceeded $1 million. His 1979 Federal income tax return shows a tax of $86,519 on an adjusted gross income of $187,274. While readily conceding he should never have commingled the funds, respondent repeatedly and emphatically denied any intent to permanently retain the $27,500 or to keep it beyond the time at which Federal estate tax clearance was received for the estate. He conceded that John Smith was entitled to interest upon the repaid principal but testified he had made no effort to pay it during the pendency of the Illinois proceedings because his attorney thought he ought not to do so. He also testified, somewhat imprecisely, that he kept the securities purchased with the $27,500, or the receipt for them, in a lock box attached to the escrow agreement or other papers explaining the custody arrangement.

Some 35 letters or statements from judges, legislators, lawyers, the Terre Haute chief of police and officers, a minister, and other community leaders were introduced attesting to respondent's professional ability, community activity and standing, and his good reputation prior to the

disbarment. These character statements portray respondent as an honest, outspoken, hardworking lawyer who was quite active in community affairs and who represented his clients with ability, dedication and vigor. Several tell of his unpaid services to indigent clients and community organizations; several others suggest the disciplinary proceedings to have been politically inspired. In addition to the statements attesting to a somewhat unusual amount of community activity, respondent testified to his service in the armed forces, to the presidencies or equivalent positions held by him in his church groups, veterans' organizations, service clubs, and PTA clubs, and to his former memberships in various bar organizations. He further testified that about the time the disciplinary proceedings commenced in Indiana he returned to Indiana University and audited a course in legal ethics. It was disclosed by respondent during the Illinois proceedings that he had received a private reprimand from the Indiana Supreme Court in connection with his service as a probate commissioner. While its basis is not entirely clear, that reprimand apparently resulted from respondent's subsequent representation of heirs in an estate in which he, as probate commissioner, had originally admitted the will to probate. The import of respondent's testimony was that he had inadvertently overlooked his earlier part in the formality of admitting the will to probate.

There is, of course, not the slightest doubt that respondent's handling of the $27,500 constituted a prohibited commingling and conversion of client funds. (79 Ill. 2d R. 9—102.) Respondent readily concedes the error of his conduct and indicates his willingness to pay John Smith interest for the periods, ranging from six months to two years, during which respondent received the income from the converted funds. The Indiana Supreme Court viewed the conduct as not merely poor accounting practices but, rather, as a deliberate course of conduct designed to benefit respondent at the expense of the estate. It considered disbarment

necessary "in order to demonstrate this Court's total abhorrence of the acts of misconduct." (\_\_ Ind. \_\_, \_\_, 397 N.E.2d 574, 579-80.) While respondent's substantial income and net worth tend to support his disavowal of any intent to permanently convert the funds, and also militate against any need on his part for the comparatively insignificant amount of income from the converted funds, it seems odd that he made no effort to reimburse the estate or Smith for the lost earnings. It is undisputed, too, that the conversions were not inadvertent, but were, as the Indiana court indicated, the result of an intentional, deliberate course of conduct. That the arrangement was agreed to by respondent's elderly, lay coexecutor affords no justification for the surprising insensitivity to his professional responsibilities manifested by respondent. If he was, as he appears to have been, seriously concerned as to additional taxes, it would have been a simple matter to have retained the identical amounts in the estate account.

Two principal purposes of our disciplinary system are to safeguard the public and maintain the integrity of the legal profession. (*In re Spencer* (1977), 68 Ill. 2d 496, 501.) As this court pointed out in *In re Clayter* (1980), 78 Ill. 2d 276, 281:

> "The commingling of funds and depositing clients' funds or other money held by an attorney for another in an account standing in the attorney's name alone endangers the security of the interests of those to whom the money belongs. Commingling of funds has been the first step in a large number of cases which this court has considered involving wrongful conversion of funds by attorneys. Also, when funds belonging to another are deposited in an attorney's personal account, there is the danger of the conversion of these funds by operation of law; that is, in case of the death or insolvency of an attorney, these funds could well become assets of his estate, leaving the rightful owner with only a claim of a creditor against the attorney's

estate. For these reasons, it is essential that such money be held in such a manner that there can be no doubt that the attorney is holding it only for another and that the money does not belong to him personally."

This court has consistently condemned commingling, and the conversion which so frequently results has been the occasion for disciplinary action ranging from disbarment (*In re Smith* (1979), 75 Ill. 2d 134) to censure (*Clayter;* see also *In re Schlax* (1980), 81 Ill. 2d 66; *In re Brody* (1976), 65 Ill. 2d 152; *In re Smith* (1976), 63 Ill. 2d 250; *In re Sherman* (1975), 60 Ill. 2d 590; *In re Wyatt* (1972), 53 Ill. 2d 44; *In re Fumo* (1961), 22 Ill. 2d 429; *In re Lingle* (1963), 27 Ill. 2d 459). Without intending to minimize the serious nature of respondent's misconduct, it can fairly be said that the instances in which this court has disbarred lawyers because of commingling and conversion have involved circumstances of a substantially more aggravated character than appear here. (See, *e.g., In re Smith* (1979), 75 Ill. 2d 134; *In re Stillo* (1977), 68 Ill. 2d 49; *In re Smith* (1976), 63 Ill. 2d 250; *In re Ahern* (1962), 26 Ill. 2d 104.) So far as this record indicates, respondent had no intention of permanently retaining the funds; he was always in a position to repay the $27,500 and did so promptly in the amount requested as soon as he became aware that John Smith was objecting. These facts differ from the usual case involving commingling and conversion where the funds are restored only after lengthy delays during which the client has vainly sought to obtain that to which he was rightfully entitled. *In re Brody* (1976), 65 Ill. 2d 152; *In re Wyatt* (1972), 53 Ill. 2d 44; *In re Fumo* (1961), 22 Ill. 2d 429.

Unquestionably, a substantial disciplinary sanction is called for, but we are of the opinion that suspension is sufficient. Respondent will apparently be eligible to seek reinstatement in Indiana after November 15, 1984. Were we to disbar here, our rules, as do Indiana's, preclude reinstatement for five years. Considering respondent's repentant

attitude, his prior good reputation, and his community activities, we believe it unnecessary for the protection of the public or the integrity of the profession (*In re Saladino* (1978), 71 Ill. 2d 263) to extend a suspension beyond the time at which respondent can seek readmission to practice in Indiana.

Accordingly, respondent is suspended until November 15, 1984.

*Respondent suspended.*