(No. 55035.—

*In re* JAMES D. FREEL, Attorney, Respondent.

*Opinion filed February 19, 1982.*

UNDERWOOD, WARD and MORAN, JJ., dissenting.

David Beckerman, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

James D. Freel, of Chicago, *pro se.*

JUSTICE GOLDENHERSH delivered the opinion of the court:

On May 9, 1980, the Administrator of the Attorney Registration and Disciplinary Commission (Commission) filed a one-count complaint against respondent, James D. Freel, who was admitted to the practice of law on November 19, 1954. A panel of the Hearing Board found that the Administrator had proved by clear and convincing evidence that respondent had failed to properly account for his client's funds, had failed promptly, upon request, to pay and deliver the client's funds, and had commingled the client's funds with his own. The panel recommended that respondent's license to practice law be suspended for three months. Both the Administrator and respondent filed exceptions to the report of the Hearing Board. The Review Board ordered that respondent be reprimanded. We allowed the Administrator's petition for leave to file exceptions. 73 Ill. 2d R. 753(e).

On May 14, 1974, John Meyers was injured while working. Meyers retained respondent, and respondent negotiated a settlement of Meyers' workmen's compensation claim and was paid a fee. In 1975, Meyers asked respondent to represent him in a personal injury action against the company on whose premises he was injured. Meyers and respondent agreed orally to a one-third contingency fee. In March 1976 respondent filed suit, and in November 1978 the case was settled for $2,500.

Respondent explained to Meyers that his former employer's compensation carrier had claimed a lien on the settlement funds. Respondent negotiated a reduction of the lien to $1,000. The respondent received a check in the amount of $2,500 payable to Meyers and his wife, respondent, and the employer's compensation carrier. Meyers and his wife endorsed the check in December 1978 and returned it to respondent. Respondent endorsed the check but did not send it to the employer's insurance carrier until late Feb-

ruary 1979. Between December 1978 and March 1979, Meyers telephoned respondent's office and home at least two dozen times to inquire what had happened to the settlement money. Meyers also visited respondent's Chicago office on two occasions, but was told each time that respondent was not in. During this period Meyers was unable to learn anything regarding the settlement. He mailed a complaint to the Attorney Registration and Disciplinary Commission, relating the foregoing events. The complaint was received by the Commission on March 7, 1979.

The employer's compensation carrier received the fully endorsed check late in February. On March 1, 1979, it issued a check payable to Meyers and respondent in the amount of $1,500, the amount of the check less the amount agreed upon in settlement of the lien. On March 5, 1979, respondent mailed this check to Meyers for his endorsement. Meyers received the check after he had filed the complaint against respondent with the Commission. Nevertheless, on March 9, 1979, Meyers endorsed the check and returned it to respondent.

When respondent received the check he deposited $1,400 in his business account and took $100 in cash. Bank records admitted into evidence show a deposit in the amount of $1,400 on March 14, 1979. Respondent admitted that the account in which the money was deposited was his only business account. It was not a clients' trust account or escrow account. Respondent did not prepare a settlement sheet or show Meyers receipts for court costs or doctor bills which were to be deducted from his share of the settlement.

Meyers again telephoned respondent about the settlement, but respondent, having learned of the complaint pending before the Commission, told Meyers to "buzz off." He told Meyers that he would wait for the Commission to act before he disbursed any funds. In letters addressed to

the Attorney Registration and Disciplinary Commission, dated March 23, 1979, and April 6, 1979, respondent stated that distribution of the funds awaited the directions of the Commission.

Meyers employed Sara Lyn Smith, an attorney, to recover the settlement funds. On September 26, 1979, respondent forwarded to Smith a check made out to Meyers and Smith in the amount of $468.25, the amount respondent asserted was due Meyers after deduction of expenses and court costs and respondent's one-third contingency fee. The check was dated March 14, 1979. A handwritten settlement statement sent with the check showed that $498.75 was deducted for a "doctor's bill" and $49.50 for "court costs." Respondent had not previously mentioned the doctor's bill to Meyers or Smith and had not shown either of them the bill. Smith deposited the check in her clients' trust account, but the check, due to its "stale" date, was not paid.

Eileen Downey, an attorney sharing office space with Sara Lyn Smith, took over the matter and wrote respondent concerning the returned check. Respondent responded in a handwritten message stating, "I have placed the net proceeds previously tendered in the bank at Platteville, Wis. If you want it please advise. If you insist on more, file suit." Downey testified that because of the vague language of the note and the fact that respondent did not indicate the name of the bank in which the funds were held, she did not consider this to be a settlement tender. She filed suit for $1,000, and the case was later settled for $700.

At the hearing before the Hearing Board panel, respondent explained that the check which he sent to Sara Lyn Smith on September 26, 1979, was dated March 14, 1979, because that was the date on which he had written in Meyers' name, the date, and his signature. He did not calculate the amount due to Meyers and send him the check

at that time because he hoped to negotiate a reduction of the doctor's bill. When Smith demanded the money, he added her name to the check to secure her attorney's lien and inserted the amount he thought was due and owing to Meyers.

Respondent testified that some time after depositing the funds he placed fourteen $100 bills with which he had intended to purchase "classical stamps" in an envelope and put the envelope in his file. He stated that he paid the doctor's bill, in cash, out of these funds. The file in which this envelope was kept was lost for some time but was found shortly before the hearing.

Respondent also testified that after the check issued to Smith and Meyers was returned as a "stale" item, he went to Platteville and opened a bank account in the amount he felt was due and owing to Meyers. He stated that this was the account to which he referred in his communications to attorney Downey. He stated that, at the pretrial conference at which the suit filed by Downey was settled, she demanded cash. She refused to have the bank account handed over to her because respondent had indicated that there would be some delay in getting the proceeds of the account because it was a "90-day account."

The hearing panel recommended that respondent be suspended from the practice of law for three months. On review, the Review Board of the Attorney Registration and Disciplinary Commission, in lieu of recommending disciplinary action by this court, issued a reprimand. The Review Board gave no reasons for its order.

The Administrator argues that the findings of the Hearing Board that the respondent had commingled his client's funds with his own, had converted these funds to his own use, and had failed to account to his client concerning the handling of these funds were proved by clear and convincing evidence. He argues that the evidence also shows conversion of the funds and that respondent's misconduct

"warrants suspension from the practice."

Respondent's testimony is sufficient to support all three of the hearing panel's findings. He admitted that he deposited the settlement check into his business account and not into a trust account. Rule 9—102 of the Code of Professional Responsibility provides that "all funds of clients paid to a lawyer or law firm, including funds belonging in part to a client and in part presently or potentially to the lawyer or law firm, shall be deposited in one or more separate identifiable trust bank accounts maintained in the State in which the law office is situated." (81 Ill. 2d R. 9—102.) Respondent's conduct clearly violated this rule. Respondent also admitted that he did not respond to his client's inquiries as to what had happened to the settlement funds and, after learning of the complaint filed with the Commission, refused to turn over even the amount he believed was due and owing to his client. This violated subsection (c) of Rule 9—102:

"(c) A lawyer shall

* * *

(4) promptly pay or deliver to the client as requested by a client the funds * * * in the possession of the lawyer which the client is entitled to receive." 81 Ill. 2d R. 9—102(c).

The records of respondent's bank account for the period from December 11, 1978, to October 10, 1979, were admitted into evidence. Except for eight days near the end of that period the balance shown exceeded the amount due Meyers. Average daily balances during any 30-day period ranged from a high of $6,944.31 to a low of $633.33. While it might be argued under *In re Clayter* (1980), 78 Ill. 2d 276, 283, that there was a "technical conversion" of the funds, the hearing and review boards did not err in refusing to find that respondent had converted his client's funds.

Respondent's contention that because he kept the funds in an envelope there was no commingling is not supported by the authorities. Similar practices were disapproved in *In*

*re Clayter* (1980), 78 Ill. 2d 276, and *In re Lingle* (1963), 27 Ill. 2d 459.

Respondent was apparently of the opinion that after the filing of the complaint with the Commission it was proper for him to refuse to attempt to settle the dispute concerning his client's funds. The pendency of the charge that an attorney is improperly withholding clients' funds does not suspend the attorney's duty imposed by Rule 9—102(c)(4) to immediately pay over clients' funds upon request. As an attorney, respondent should have known that the Attorney Registration and Disciplinary Commission had no jurisdiction to issue orders concerning the disbursement of those funds.

We consider the question of the appropriate sanction to impose in this case. This court has consistently condemned the practice of commingling clients' funds with those of the attorney. (*In re Clayter* (1980), 78 Ill. 2d 276, 281; *In re Sherman* (1975), 60 Ill. 2d 590.) While each case is unique, we have held that "Predictability and fairness require that there be a degree of consistency in the sanctions imposed for similar types of conduct ***." (*In re Hopper* (1981), 85 Ill. 2d 318, 324.) Sanctions should be imposed consistent with those imposed in cases with factual situations substantially similar to the case under consideration. (*In re Clayter* (1980), 78 Ill. 2d 276, 283.) Although it is not necessary that an attorney act with dishonest motives to warrant discipline (78 Ill. 2d 276, 283; *In re Bloom* (1968), 39 Ill. 2d 250, 254), cases involving infractions of the rules similar to those shown here have usually warranted censure of the attorney. (See *In re Clayter* (1980), 78 Ill. 2d 276, 283; *In re Sherman* (1975), 60 Ill. 2d 590, 592.) The facts in *Clayter* and *Sherman* are similar to those here. Respondent has practiced law since 1954, and this appears to be the only incident involving unprofessional conduct. We conclude that on this record the appropriate sanction is censure.

*Respondent censured.*

JUSTICE UNDERWOOD, dissenting:

I cannot agree that no conversion occurred here, nor do I agree that censure is an adequate sanction for the insensitivity to his professional responsibilities which respondent has manifested.

It is undisputed that for two months after securing Meyers' (his client's) endorsement thereon respondent, for no apparent reason, delayed forwarding to the compensation insurer a check received in settlement of Meyers' action against a third party. During that period he completely ignored the client's numerous calls and visits inquiring about the settlement proceeds. After respondent finally acted and received the $1,500 due Meyers, it was deposited in respondent's personal account, the balance in which subsequently fell below the amount owed the client.

Respondent received the $1,500 early in March 1979. He made no effort to distribute to Meyers the money to which he was entitled until Meyers employed other counsel to collect the funds. Respondent in September, six months late, forwarded to that attorney a check dated March 14 for an amount substantially less than anticipated by Meyers. Most of the difference was claimed by respondent to represent an unpaid doctor's bill. Respondent's check was not honored by the drawee bank because of its date. Respondent's explanation of the stale date was that he had written the client's name and the date on the check and signed it on March 14, but did not fill in the amount because he hoped to compromise the doctor's bill.

Respondent also stated that when he deposited the client's $1,500 check in his personal account he kept $100 in cash, and that he subsequently withdrew $1,400 in $100 bills which he placed in an envelope in his file. From this, he stated, he paid the doctor's bill. Meyers eventually received $700 after being compelled to file suit to

secure his money.

When a lawyer places money belonging to a client in his personal account, as respondent did here, instead of in a trust account, he has, of course, violated the prohibition against commingling codified in Rule 9—102 of the Code of Professional Responsibility (81 Ill. 2d R. 9—102). When that account is dissipated by him to the point where it no longer equals or exceeds the amount due the client, the commingling becomes conversion, as the Hearing Board held in this case, and as we have repeatedly indicated. (*In re Grant* (1982), 89 Ill. 2d 247; *In re Clayter* (1980), 78 Ill. 2d 276; *In re Bloom* (1968), 39 Ill. 2d 250.) Whether respondent might have been able to secure funds from other sources with which to pay the client may be a relevant argument in mitigation of punishment, but on the issue of conversion that argument was said by this court in *In re Brody* (1976), 65 Ill. 2d 152, 157, to be "groundless." See also *In re Kesler* (1982), 89 Ill. 2d 151.

Even assuming the truth of respondent's testimony that he had placed fourteen $100 bills in a file which was subsequently "lost" until just before the hearing, that money was apparently not intended for his clients, since he stated he intended to buy "classical stamps" with the balance remaining after his claimed payment of the doctor's bill. In any event, such handling of clients' funds has been consistently condemned by this court. *In re Clayter* (1980), 78 Ill. 2d 276; *In re Lingle* (1963), 27 Ill. 2d 459.

Phrased in its simplest terms, what we have before us is a lawyer who neglected for two months to collect a check due his client, meanwhile ignoring repeated phone calls and office visits by the client; then he finally acted but deposited the proceeds therefrom in his personal account, which was subsequently depleted to the point where it was insufficient to cover the amount owed the client; thereafter, he neither gave nor sent to the client

even the amount respondent admitted owing until after the client secured another attorney and filed suit.

This court has frequently spoken of its responsibility to discipline the legal profession. (*In re Neff* (1980), 83 Ill. 2d 20, 25; *In re Zahn* (1980), 82 Ill. 2d 489, 494; *In re Sherman* (1975), 60 Ill. 2d 590, 593.) In *In re Abbamonto* (1960), 19 Ill. 2d 93, 98, we said and repeated in *In re Bloom* (1968), 39 Ill. 2d 250, 254: "It is vital to the well-being of society that an attorney, who is an officer of the court and a part of our judicial system, should maintain the most scrupulous care in conducting his professional and business affairs." If the protection to the public which our adoption of the Code of Professional Responsibility was intended to provide is to be meaningful, something more than censure is needed here.

WARD and MORAN, JJ., join in this dissent.