(No. 56120.—

*In re* PAUL A. McLENNON, Sr., Attorney, Respondent.

*Opinion filed December 17, 1982.*

216

WARD, J., took no part.

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte and Mary Ellen Rosen, of counsel), for respondent.

JUSTICE UNDERWOOD delivered the opinion of the court:

Respondent, Paul A. McLennon, Sr., was charged in a complaint filed December 9, 1980, by the Administrator of the Attorney Registration and Disciplinary Commission (73 Ill. 2d Rules 751 through 771) with unethical and unprofessional conduct tending to bring the courts and legal profession into disrepute. The conduct charged included conversion and commingling client funds, and the failure to maintain a complete record of such funds, as well as the failure to promptly disburse funds due a

client. The Hearing Board found respondent guilty of commingling, conversion and failure to maintain complete records of client funds, but concluded that he was not guilty of overreaching or failure to promptly pay funds due a client. It also found that respondent was not dishonestly motivated and recommended that he be reprimanded. The Administrator filed exceptions, and the Review Board concluded that, regardless of motive, respondent's conduct tended to bring the courts and legal profession into disrepute and that a three-month suspension constituted a more appropriate sanction. Respondent filed exceptions, and we permitted the Administrator to do likewise. 73 Ill. 2d R. 753(e).

The evidence before the Hearing Board established that respondent, a sole practitioner, had settled a personal injury action on behalf of his client, Arthur Rittenhouse, in January 1971. After obtaining the client's endorsement, respondent deposited the $10,000 settlement draft in his general office account. Several months later, respondent received an additional $200 settlement draft which he deposited in his escrow account. At that time, respondent's fees amounted to $3,300 and costs due him were $189.30. Aetna Life Insurance Company had a subrogation lien on the recovery up to the amount advanced by Aetna for medical expenses, which respondent testified had reached approximately $6,000. Respondent also testified that Arthur Rittenhouse believed the lien might be cancelled, and he had orally requested respondent to hold the settlement money pending a resolution of that question.

Although respondent represented Arthur on subsequent matters and periodically discussed the settlement fund with him, respondent testified that Arthur continued in his desire that respondent hold the money because the lien had not been compromised. Consequently, respondent had not disbursed the money at the time of

Arthur's death in December 1975.

Respondent also testified that he destroyed his old records, including bank statements, when he moved from the home in which they were stored. Bank records were not available for this period either. Respondent testified, however, that he must have used some of the settlement money in the office account for his own purposes. He further related that he had earmarked for payment to Arthur a $10,000 certificate of deposit which he had purchased in 1970. This certificate, which was issued in his name and that of his mother, was later redeemed with part of the proceeds being paid to the mother. He used the balance of the proceeds, which amounted to just over $10,000, to make an unsecured loan to a fellow attorney in 1977.

Respondent first learned of his client's death in July 1976, when he received a letter from Wayne Hough, a Baltimore attorney, in which the latter stated he represented Patricia Levitt, the executrix of Arthur's estate. Although the letter requested information concerning the proceeds of the 1971 settlement, respondent testified that he did not know Mrs. Levitt and was unwilling to disclose any information without first being furnished with evidence of her authority. He stated that he had requested that evidence by telephone, but never received it. In addition, respondent more than once examined the probate records in Du Page County, where Arthur had resided and owned property, but found no evidence that an estate had been opened. He further testified that he had also received telephone calls from an attorney in Pittsburgh and a woman in Florida inquiring about the Rittenhouse settlement.

Upon receiving a subsequent letter, dated December 28, 1976, from a Chicago attorney stating he represented Mrs. Levitt, respondent again requested proof and refused to disclose any information. On August 16,

1978, Mrs. Levitt complained to the Attorney Registration and Disciplinary Commission and sent a copy of her letter to respondent. Shortly thereafter, respondent sent a check for $6,610.70, representing the net principal of the settlement, to Wayne Hough in Baltimore. Respondent testified that he and attorney Hough had orally agreed to discuss at a later date the amount of interest due, and that the latter had promised that the check would not be cashed until evidence of Mrs. Levitt's authority had been sent to respondent. A "hold harmless" agreement prepared by respondent was also enclosed with the check for execution by Mrs. Levitt. Charles Fisher, who had begun representing Mrs. Levitt in place of Wayne Hough, responded with a letter demanding 36% interest on an amount of $6,800. Although respondent initially wrote attorney Fisher reiterating his request for evidence of Mrs. Levitt's authority, he later sent an interest check for $3,924.64 on December 18, 1978, without having received that proof. Mrs. Levitt then executed a release in favor of respondent.

Respondent's evidence indicated that he had practiced law for nearly 30 years with no other disciplinary complaints. Two circuit court judges appeared at the hearing on his behalf, as did an associate circuit court judge, and two other circuit court judges submitted affidavits reflecting their high regard for respondent. Affidavits and letters from several of respondent's fellow attorneys also reflect their opinion of respondent as a sincere individual of integrity. There was persuasive testimony by both a Catholic priest and a lay brother indicating that respondent frequently donated legal services and personal counseling in an effort to help misguided youths. Their opinions and information were bolstered by testimony, the sincerity of which is evident even from this cold record, given by several of the individuals whom respondent had assisted during the past decade. There was testimony,

too, of recreational events organized by respondent for groups of retarded persons. Moreover, respondent's own testimony appears to have been candid and indicated a repentful awareness of his error. Also, when contacted by the Commission, it is uncontradicted that respondent turned over his entire file.

It is, of course, clear that respondent commingled and then converted the settlement funds. (*In re Cleveland* (1981), 85 Ill. 2d 520; *In re Clayter* (1980), 78 Ill. 2d 276; *In re Smith* (1976), 63 Ill. 2d 250; *In re Sherman* (1975), 60 Ill. 2d 590.) Nor can there be any dispute that he failed to maintain complete records of client funds. Respondent urges, however, that he always had funds with which to remit to the client or the estate the amounts due. We note, however, that his explanation that he viewed the $10,000 certificate of deposit in his and his mother's names as a source of such funds does not square with his actions in cashing the certificate, paying his mother the accrued interest and then making an unsecured loan of the balance to another attorney. In any event, the availability of other funds from which repayment might be made is relevant only on the question of punishment. (See *In re Brody* (1976), 65 Ill. 2d 152, 157.) Too, it seems somewhat peculiar that after repeatedly requesting proof of Mrs. Levitt's authority to receive payment of Arthur's money, respondent, after the disciplinary complaint was filed, paid without receiving such proof. His explanation that he had not thought it prudent to pay earlier because Aetna might assert its lien is somewhat diminished by the fact that he could have ascertained Aetna's intention at any time by contacting the company. Indeed, respondent admits that, once he learned of Arthur's death, he should have, at the minimum, deposited the funds with the Du Page County circuit court.

In view of the conversion, which this court has con-

sistently condemned, the Administrator urges that respondent be disbarred. When determining the appropriate discipline, however, we note that "each disciplinary case is unique" (*In re Hopper* (1981), 85 Ill. 2d 318, 324), and that we are required to give "an independent evaluation of the circumstances in each case" (*In re O'Hallaren* (1976), 64 Ill. 2d 426, 433).

Conversion of a client's funds, with or without a "dishonest motive," simply cannot be countenanced. (*In re Feldman* (1982), 89 Ill. 2d 7, 11; *In re Grant* (1982), 89 Ill. 2d 247.) This court pointed out in *In re Clayter* (1980), 78 Ill. 2d 276, 281, the potential problems which even a negligent failure by a solvent lawyer to properly identify and segregate client's funds can pose for the client if the lawyer dies. (See, too, *Grant; In re Kesler* (1982), 89 Ill. 2d 151, 161-62.) Of course, whether the commingling and conversion involved the "dishonest motive" focused on by the Review Board is highly significant, as are all of the circumstances surrounding the misconduct, in determining the sanction to be imposed. (*In re Feldman* (1982), 89 Ill. 2d 7, 11.) And, while absolute uniformity in the imposition of discipline, realistically viewed, may not be achievable, similar cases ought to receive similar treatment. *In re Feldman* (1982), 89 Ill. 2d 7, 11; *In re Clayter* (1980), 78 Ill. 2d 276, 283.

The discipline imposed in conversion cases has ranged from disbarment to censure. (See cases cited in *In re Kesler* (1982), 89 Ill. 2d 151, 162.) As was noted in *In re Clayter* (1980), 78 Ill. 2d 276, 283, where the sanction imposed was censure: "While this court has held that it is not necessary that there be evidence of dishonest motives to justify the imposition of discipline [citations], we find it appropriate to consider this factor in determining the nature and severity of the sanction to be imposed." Here, in addition to a Hearing Board finding that respondent was not dishonestly motivated, there is persua-

sive evidence of substantial contributions by respondent over the years of his time and talents in assisting both troubled individuals and handicapped groups. There is no record of other disciplinary involvement. Too, there seems no reason to doubt that had proof of Mrs. Levitt's authority as executrix been forwarded as respondent testified he requested when first contacted by her, the money due the estate would then have been paid.

Considering all of the evidence, we believe this case calls for no more than the censure ordered in *Clayter, In re Sherman* (1975), 60 Ill. 2d 590, and *In re Freel* (1982), 89 Ill. 2d 263. It is so ordered.

*Respondent censured.*

JUSTICE WARD took no part in the consideration or decision of this case.