(No. 57377.—

*In re* RAY JEFFREY COHEN, Attorney, Respondent.

*Opinion filed October 21, 1983.*

MORAN and UNDERWOOD, JJ., dissenting.

Jerome Larkin, of Chicago, for the Administrator of the Attorney Registration Disciplinary Commission.

Epton, Mullin, Segal & Druth, Ltd., of Chicago (Thomas E. Kluczynski, Barry B. Gross, and Mary F. Stafford, of counsel), for respondent.

JUSTICE SIMON delivered the opinion of the court:

The amended complaint in this disciplinary proceeding charged respondent, Ray Jeffrey Cohen, who was licensed to practice law in 1965, with commingling and converting funds belonging to a client as well as funds which were entrusted to him by clients for the purpose of paying bills for medical services. The relevant facts were undisputed.

With respect to the charge of converting funds belonging to a client, the facts were that, after settling a personal injury claim for the client, the respondent on June 17, 1977, deposited the $7,000 insurance company

draft in his business account at the Water Tower Bank. On that day he also drew and delivered to his client a post-dated check drawn on his Water Tower Bank account in the amount of $4,027.92, representing the settlement amount payable to the client less attorney fees and expenses. This check, dated June 24, 1977, was deposited by the client on the day it was dated in another bank. It reached the Water Tower Bank on June 27 but was returned by that bank the same day to the client's bank marked "NSF" (not sufficient funds).

After four months the client, who had not yet received payment, filed a complaint with the Attorney Registration and Disciplinary Commission, and approximately two weeks later, the respondent gave his client a cashier's check in the amount due to him. From the time the NSF check was drawn until restitution was made to the client, the respondent's account at the Water Tower Bank was overdrawn on several occasions; the only days on which the account showed a balance sufficient to cover the check given the client were between June 30 and July 4, 1977, and between July 6 and July 10, 1977. Although the Water Tower Bank credited the respondent's account with the $7,000 deposit on the date it was made, June 17, 1977, by June 24, 1977, there were no longer sufficient funds in the account to cover that check. The highest balance in the account during August and September 1977 was $1,061 on September 16, 17 and 18.

The second charge against the respondent related to withholding of payments which were owing to a physician for his medical services. The facts were that the respondent withheld payments from disbursements to 16 clients in personal injury suit settlements in amounts sufficient to pay the fees of the treating physician, Dr. Janin J. Raoul. These sums were withheld for a period

of more than two years, although the respondent had personally guaranteed the payment of the fees in order to obtain medical reports from Dr. Raoul. During that period, the withheld sums amounting to $2,175 were deposited in the respondent's general business accounts, and these accounts were overdrawn on various occasions.

The third charge was similar to that with respect to failing to pay Dr. Raoul, but involved another physician, Dr. Sidney Alpert, and the failure to pay $2,125 in medical bills owed by 12 of the respondent's clients.

The respondent did not make complete restitution to Dr. Raoul until 10 months after the doctor filed a complaint with the disciplinary commission and to Dr. Alpert until seven months after Dr. Alpert filed a similar complaint.

The respondent acknowledged that he failed to maintain a fiduciary account. His explanation regarding the NSF check was that he routinely sent his bank statements to his accountant without examining them and was therefore unaware that the check he gave his client was dishonored until the client filed his complaint with the disciplinary commission. Had he known earlier that the client had not received the money to which he was entitled, he would have made the check good. He testified that the client did not contact him about the NSF check and, as soon as he learned from the disciplinary commission that the client had not received payment, he delivered a cashier's check in the full amount he owed the client. The client died prior to the taking of evidence in this case, and there is no evidence in the record of any communications between the client and the respondent during the period between the time the check was dishonored and the client filed his complaint with the disciplinary commission on October 26, 1977. The re-

spondent denied that there were any such communications or that he had any knowledge prior to correspondence from the Commission that the check had been dishonored. The respondent testified that although he kept a running balance on his checking account in his checkbook, he never reconciled his bank account but instead left the matter of reconciliation entirely to his accountant.

The respondent blamed his failure to pay Dr. Raoul and Dr. Alpert on his poor bookkeeping practices; he conceded, however, that there were instances where he had withheld funds from his distribution to his clients in order to pay physician's fees and then neglected to pay them. Although both doctors eventually sent him a list of the fees they claimed they were owed, the respondent attributed his delay in paying these amounts to difficulties he encountered in verifying them because of problems in locating check stubs, cancelled checks and old files and also to marital difficulties which resulted in a prolonged separation from his family attended by severe emotional distress. He explained that because of his depression over his marital situation he found it hard to concentrate on activities which required a great deal of effort, such as locating and examining old files.

The Hearing Board's view was that the incidents of commingling and conversion were neither inadvertent nor "technical," as the respondent claimed. Rather, it concluded that the respondent's conduct resulted from a dishonest motive, finding as a matter of fact that the respondent engaged in dishonesty, fraud and misrepresentation.

The Hearing Board recommended a one-year suspension, and the Review Board recommended a three-year suspension. The Administrator complains in this court that the sanction recommended is too lenient and that

the respondent should be disbarred. The respondent on the other hand argues that based on precedent, the facts presented by the Administrator, the commendable past conduct of the respondent and mitigating circumstances, no discipline is warranted, but if he is to be disciplined nothing more severe than censure is appropriate.

An attorney is accountable for funds coming into his possession which belong to a client. Countenancing the mishandling of client's funds by an attorney because of inattention to them and to the handling of the attorney's own bank accounts unacceptably diminishes the importance of this serious responsibility. (*In re Grant* (1982), 89 Ill. 2d 247, 254.) Had the respondent maintained a trust account, as he was required to do, instead of commingling his own funds with those of his client, and had the trust account been responsibly supervised, it would have contained adequate funds to cover the check the respondent gave to his client, and the funds withheld to pay the physicians would not have been used for the respondent's personal purposes. This court warned in *In re Clayter* (1980), 78 Ill. 2d 276, 281, and in *In re Grant* (1982),89 Ill. 2d 247, 253, that commingling often results in wrongful conversion, and the difficulty in which the respondent finds himself is striking proof of the accuracy of that observation. This is why this court has repeatedly announced that commingling is an unacceptable practice regardless of why it occurred. *In re Grant* (1982), 89 Ill. 2d 247, 253.

It is clear that the respondent must be sanctioned for his misconduct in failing to maintain a trust account, commingling funds and conversion of funds belonging to clients. The severity of the sanction depends on whether the conclusion of the Hearing Board that the respondent was guilty of dishonest motives is based on clear and convincing evidence or whether, as the respondent

claims, his problems are attributable only to neglect, sloppiness, inadvertence, and inattention. *In re McLennon* (1982), 93 Ill. 2d 215, 221; *In re Clayter* (1980), 78 Ill. 2d 276, 283. With respect to the NSF check, it is clear that the respondent used his client's funds for four months. We are hampered, however, in searching for support for the Hearing Board's finding by the unavailability of the client. Were the client available to testify, perhaps the record would be far different than it is. On the basis of the record as it exists, however, and on which we must rely, there is no evidence that the client complained to the respondent or that the respondent knew his check had been dishonored. The respondent acted promptly after being notified by the disciplinary commission that the client had complained to it to restore the client's funds by delivering a cashier's check to him. We cannot assume that the client notified the respondent of the NSF check when no such evidence is in the record, even though it is unlikely that the client did not complain to the respondent or at least try to reach him to complain. Moreover, had the client redeposited the check on the date it was returned to his bank, it is likely that it would have reached the Water Tower Bank at a time when the respondent's account contained sufficient funds to cover the check. These circumstances raise some doubt about whether the respondent's motives in his dealing with his client were dishonest, and in any event dishonest motives in this regard have not been proved by the clear and convincing evidence which is the standard required in disciplinary proceedings by our Rule 753(c) (87 Ill. 2d R. 753(c)). *In re Crane* (1983), 96 Ill. 2d 40, 65.

It is clearer that for a period of time the respondent knew he had clients' funds in his possession which were supposed to have been paid to Dr. Raoul and Dr. Alpert

but instead appropriated them to his own use, retaining them for as long as three or four years. It is true, as the respondent points out, that after the passage of at least a year Dr. Raoul and Dr. Alpert both sent him separate lists of patients whose fees they claimed were due, but neither list was accurate. Both lists contained names of patients for whom no recovery had been effected or for whom the doctors had already received payment. Several of the names furnished by the physicians to the respondent were not included by the Administrator in his amended complaint, most likely indicating that the Administrator, after investigation, determined that the respondent owed nothing for these clients. This, however, does not excuse the respondent's failure to pay the fees for those patients listed in the amended complaint when the respondent first withheld these funds from the client. Had he paid them at that time there would have been no need for the physicians to submit lists to the respondent of what they thought several months or even years later were their unpaid bills.

It is clear, as the Hearing Board determined, that there were clients who did entrust the amount they owed Dr. Raoul and Dr. Alpert to the respondent, and the respondent failed to pay these bills for up to four years after he received the funds. A poor system of distributing settlements or sloppy bookkeeping, to which the respondent attributed his delay in paying these fees, does not justify his failure to make prompt payment. *In re Grant* (1982), 89 Ill. 2d 247, 254.

Moreover, the evidence affirmatively supports the finding that dishonest motive rather than a poor bookkeeping or payment system explains the delay in settling with the physicians. Responding by letter to an inquiry by one of the Commission's attorneys concerning Dr. Raoul's complaint, the respondent explained:

"As to how this could have occurred? My only answer is that I used to pay the doctor upon receipt from my client of a signed statement indicating his receipt of his share of the settlement. Unfortunately, I have since discovered that since the client often wouldn't sign it and return it (out of neglect, not dissatisfaction) and thus I would have nothing to 'trigger' my payment of the doctor."

This explanation is demonstrably not a valid one, for in the case of all of Dr. Raoul's patients listed in the amended complaint with the exception of one, the respondent had in his possession a settlement sheet signed by the client on which the amount of expenses retained by the respondent to pay the doctor was set forth as well as the respondent's fee and the amount received by the client. Thus, the respondent had these settlement sheets to "trigger" his payment to Dr. Raoul, but he nevertheless failed to pay him the amount the client had left in the respondent's safekeeping for that purpose. The respondent had his clients sign similar settlement sheets for the amounts owed to Dr. Alpert.

In view of the unsatisfactory nature of the respondent's explanation, we are not persuaded by the respondent's argument that the instances alleged in the amended complaint of patients whose fees were not paid to Dr. Raoul and Dr. Alpert were the result of inadvertence rather than an intentional practice and that no pattern of failure to pay the physicians was established. On the contrary, the pattern the respondent followed in withholding fees he represented to his client he would pay to a physician was one which he could expect to go undetected for a long period of time, for the doctor would have no knowledge that the claim had been settled and the client had no reason to believe that his doctor had not been paid. (*In re Grant.*) In his brief the respondent lists six categories into which the doctors' fees involved in this case fell. The sixth category

was described by the respondent as follows: "On certain cases money for the doctors·had been withheld and the doctors had not been paid—on these cases the doctors were paid by Mr. Cohen." Unfortunately for the physicians and for the respondent, in these instances, which involve almost all of the patients whose names are set forth in the amended complaint, the physicians did not receive payment until several years after the respondent withheld the money to pay them and until several months after the doctors complained to the Commission; the withholding of payments to these physicians for the length of time the respondent used these funds has not been satisfactorily explained by the respondent.

According to Dr. Raoul's testimony, the respondent refused to take his telephone calls and the doctor was only able to reach the respondent to complain his fees had not been paid when immediately after he tried unsuccessfully to call the respondent, he had his receptionist, posing as a client, call the respondent who then immediately answered the phone. All of these circumstances lead us to conclude that the evidence supported the Hearing Board's finding that the respondent's motives were dishonest with respect to his failure to pay the physicians.

We do not regard the respondent's conduct as being as flagrant as that of attorneys in cases such as *In re Bizar* (1983), 97 Ill. 2d 127, *In re Grant* (1982), 89 Ill. 2d 247, *In re Kesler* (1982), 89 Ill. 2d 151, *In re Feldman* (1982), 89 Ill. 2d 7, *In re Snitoff* (1972), 53 Ill. 2d 50, or *In re Gartland* (1970), 47 Ill. 2d 177, where the charge was conversion of funds and the sanction imposed was disbarment or suspension for one year or longer. For example, in *In re Grant* (1982), 89 Ill. 2d 247, the attorney was suspended for two years after separately converting funds belonging to six different clients, giving at least two clients checks which were returned because of insufficient funds, keeping

clients waiting in one instance at least six months and in another instance a year and a half until he made restitution, and failing to respond to calls from clients inquiring about what had happened to their money. In *In re Bizar* (1983), 97 Ill. 2d 127, the attorney, who was suspended for a year, endorsed his client's name and deposited a settlement check in his own account without informing the client, proceeded to use the funds for his own purposes and then took the position that the client had loaned him the money, testimony which the Hearing Board did not believe.

We have said that our goal is to impose sanctions "consistent with those imposed in cases with factual situations substantially similar to the case under consideration" while at the same time acknowledging that "each case is unique." (*In re Freel* (1982), 89 Ill. 2d 263, 270.) In *In re McLennon* (1982), 93 Ill. 2d 215, 221, we said "while absolute uniformity in the imposition of discipline, realistically viewed, may not be achievable, similar cases ought to receive similar treatment." Although the following types of considerations have never been regarded as controlling in deciding what discipline should be imposed, and disbarment or suspension for as long as two years has been ordered even in instances when one or more of the following mitigating factors have been present (*In re Grant* (1982), 89 Ill. 2d 247, 254; *In re Feldman* (1982), 89 Ill. 2d 7, 13), they have consistently and traditionally been referred to by this court as factors in mitigation of the seriousness of the offense charged and they are presented in mitigation by the respondent here: the respondent has been in practice for 18 years and this is the only time he has been charged with misconduct (*In re Freel* (1982), 89 Ill. 2d 263, 270; *In re Clayter* (1980), 78 Ill. 2d 276, 283; *In re Sherman* (1975), 60 Ill. 2d 590, 593; *In re Bizar* (1983), 97 Ill. 2d 127); the respondent made complete restitution to his client and to both physicians several months before the Discipli-

nary Commission filed a complaint against him (*In re Bizar; In re Sherman* (1975), 60 Ill. 2d 590, 592); the respondent's contributions to the public good through community work and civic effort have been extensive (*In re Clayter* (1980), 78 Ill. 2d 276, 283; *In re Kesler* (1982), 89 Ill. 2d 151, 163); his history of community service and *pro bono* work has been significant (*In re Grant* (1982), 89 Ill. 2d 247, 254; *In re Coburn* (1982), 92 Ill. 2d 472, 474-75); without compensation, the respondent took a case to the United States Supreme Court (*Kusper v. Pontikes* (1973), 414 U.S. 51, 38 L. Ed. 2d 260, 94 S. Ct. 303) which broadened voting rights throughout the country; and in addition he devoted his time and effort to combating a zoning ordinance which subsequently proved to have been connected with an alleged bribe to a member of the Chicago city council (see *Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555), which allowed commercial development of a large area on the northwest side of Chicago which, as a result of civic effort of which the respondent was a part later, became a major neighborhood park and recreation facility. In addition, two Cook County circuit court judges, an associate judge of the Cook County circuit court, the Cook County clerk, and an insurance company representative who often was the respondent's adversary testified regarding his good reputation for honesty and integrity, his ability as a lawyer and his reputation for devoting himself to community service. A physician who treated the respondent's clients testified he has "never had any problem receiving payment for his services out of settlements negotiated by" the respondent. *In re Bizar* (1983), 97 Ill. 2d 127; *In re Kesler* (1982), 89 Ill. 2d 151, 163; *In re Clayter* (1980), 78 Ill. 2d 276, 283.

Notwithstanding these mitigating factors, all of which speak loudly in the respondent's favor, we must keep in mind that the respondent's misconduct was not an isolated

incident. There is a pattern of misbehavior here involving 28 separate payments owing by the respondent to two physicians which became due at various times over a period of three years in the case of Dr. Raoul and two years in the case of Dr. Alpert. In addition, of course, while perhaps not the consequence of dishonest motives, the respondent's improper handling of the $4,027.92 owing to his client must also be considered in deciding what sanction is appropriate. Because of the respondent's misconduct, the legal profession has been brought into disrepute. (See *In re Feldman* (1982), 89 Ill. 2d 7, 13.) The court's responsibility in a disciplinary proceeding is " 'to safeguard the public, maintain the integrity of the legal profession and *** protect the administration of justice from reproach.' " (*In re Feldman* (1982), 89 Ill. 2d 7, 12; *In re Grant* (1982), 89 Ill. 2d 247, 254.) Suspension rather than censure is therefore in order. In view of the relatively modest amounts which were withheld from Dr. Raoul and Dr. Alpert, the fact that respondent's misconduct was limited to his dealings with only two physicians and one client and the mitigating circumstances the respondent has advanced, we believe that suspension for 18 months is a fair sanction, as well as one consistent with others we have imposed.

*Respondent suspended.*

JUSTICE MORAN, dissenting:

I find that the sanction imposed by the majority is not commensurate with the misconduct of respondent. This court has held that "[w]hen a lawyer *** converts a client's funds to his own personal use he commits an act involving moral turpitude, and, in the absence of mitigating circumstances, such conversion is a gross violation of the attorney's oath, calling for the attorney's disbarment." *In re Stillo* (1977), 68 Ill. 2d 49, 54.

We are confronted, in the instant case, with a lawyer

who deposited clients' money in a general business account, rather than an identifiable trust account, in total violation of the prohibition against commingling codified in Rule 9—102 of the Code of Professional Responsibility (87 Ill. 2d R. 9—102). Moreover, by depleting the account to a level below the amount due the client, respondent was guilty of conversion. (*In re Freel* (1982), 89 Ill. 2d 263, 272.) A great deal of attention has been given to "motivation" in the disposition of this case. Motive is not an element in disciplinary actions for conversion. This court has, however, found it appropriate to consider dishonest motive in its determination of the nature and severity of sanctions to be imposed in such cases. *In re McLennon* (1982), 93 Ill. 2d 215, 221; *In re Clayter* (1980), 78 Ill. 2d 276, 283.

Both the hearing and review boards found that respondent's misconduct was not inadvertent or "technical" but rather the result of dishonest motive. The majority concurs that respondent's motives were dishonest regarding the withholding of the doctors' fees but does not find that dishonest motive was clearly and convincingly proved regarding respondent's dealings with his client. (98 Ill. 2d at 139-40.) I find the hearing and review boards' finding of dishonest motive and intent in relation to the client fully supported by the facts and circumstances herein.

"Motive and intent are rarely the subject of direct testimony; they must ordinarily be inferred from conduct and from the circumstances under which that conduct took place." (*In re Schwarz* (1972), 51 Ill. 2d 334, 336.) It strains the imagination to believe that respondent was unaware, for over four months, that the $4,027.92 check he had issued to his client had been returned "NSF" (not sufficient funds). Certainly the burden is not on a client to complain, as inferred by the majority, in order for the court to conclude that dishonest motive is present. Respondent deposited the $7,000 settlement draft into a busi-

ness account which he knew had a history of overdrafts. In addition, he expended all but a small percentage of the settlement funds within one week of deposit while waiting more than four months to make restitution.

While the specific facts of every case must be considered, "predictability and fairness require a degree of consistency in the selection of sanctions for similar types of misconduct." (*In re Saladino* (1978), 71 Ill. 2d 263, 275.) Respondent has engaged in a pattern of commingling funds of clients, converting these funds, and failing to promptly pay funds owing to both clients and doctors. This court has imposed more stringent sanctions than an 18-month suspension in cases involving similar or less egregious misconduct.

In *In re Grant* (1982), 89 Ill. 2d 247, respondent, in four instances, converted funds collected in settlement of clients' personal injury claims. As in the instant case, settlement checks were deposited in accounts which were utilized for personal and business purposes as well as for clients' funds. In addition these accounts were either overdrawn or below the amount due clients on numerous occasions during the relevant periods. The respondent failed to promptly pay clients the money to which they were entitled. In two instances NSF checks were issued to clients. The respondent in *Grant* was involved in four counts of conversion, as opposed to the 29 acts of conversion involved in the instant case. Notwithstanding the less aggravated circumstances and substantial evidence of good character, the court imposed a two-year suspension in *Grant*.

In *In re Smith* (1976), 63 Ill. 2d 250, a $69,999 settlement check had been deposited in a lawyer's personal bank account, with the consent of his client. After forwarding $9,000 of the proceeds to the client, the lawyer made unauthorized personal use of the balance of the funds. Only af-

ter the commencement of disciplinary proceedings was the client fully reimbursed. Although the respondent in *Smith* had converted the funds of only one client, the court found disbarment an appropriate sanction.

The pattern of misconduct involved in *In re Snitoff* (1972), 53 Ill. 2d 50, closely resembles the facts and circumstances of the instant case. The respondent in *Snitoff* was disbarred for repeated acts of conversion. He was found to have issued NSF checks to clients as the proceeds of personal injury settlements, failed to promptly forward one client's share of a settlement, and failed to remit the entire amount due another client. As in the instant case, the respondent in *Snitoff* was found to have converted funds which he had withheld from personal injury settlements to satisfy medical expenses of the client. The court held that the sanction of disbarment was appropriate in spite of the respondent's plea of fiscal ineptness rather than dishonest motive. Respondent's conduct, in the case at bar, is at least as aggravated as that displayed in *Snitoff*.

Although significant evidence of good character has been offered in mitigation in the instant case, such evidence cannot overcome the clear and convincing evidence of misconduct. (*In re Melin* (1951), 410 Ill. 332, 335.) Respondent's misconduct reflects a pattern of conversion involving dishonest motive and a "continuing and consistent disregard for the property rights of his clients." (*In re Snitoff* (1972), 53 Ill. 2d 50, 53.) After reviewing the cases discussed above and the particular facts of this case, I believe that an order of disbarment is a more appropriate sanction than the suspension ordered by the majority.

JUSTICE UNDERWOOD joins in this dissent.